UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN THE MATTER OF THE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO INTERCEPT WIRE
COMMUNICATIONS OCCURRING OVER THE
CELLULAR TELEPHONE BEARING ASSIGNED CALL
NUMBER 646-964-3580, INTERNATIONAL MOBILE
SUBSCRIBER IDENTITY NUMBER ("IMSI")
316010160550888, AND URBAN FLEET MOBILE
IDENTIFICATION NUMBER ("UFMI")
176*745*7216 (THE "TARGET CELLPHONE")

UNDER SEAL

AFFIDAVIT IN
SUPPORT OF
APPLICATION FOR
AUTHORIZATION TO
INTERCEPT WIRE
COMMUNICATIONS

---

STATE OF NEW YORK              )
COUNTY OF NEW YORK             ) ss.:
SOUTHERN DISTRICT OF NEW YORK  )

JASON S. SAMUELS, a Special Agent with the United

States Department of Homeland Security, Immigration & Customs

Enforcement ("ICE"), being duly sworn, deposes and states:

## INTRODUCTION

1.    I am an "investigative or law enforcement officer

of the United States" within the meaning of Section 2510(7) of

Title 18, United States Code, that is, an officer of the United

States who is empowered by law to conduct investigations of and

to make arrests for offenses enumerated in Section 2516,

Title 18, United States Code.   I have been employed as a Special

Agent with ICE since January 2002.   From 1997 through 2001, I

worked as a United States Customs Inspector at J.F.K. Airport,

and was assigned to the passenger processing branch.   During the

course of my career, I have conducted numerous investigations of

unlawful drug distribution in violation of state and federal

narcotics laws, and have conducted or participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, distributed and the methods of payment for such drugs.

2.   I submit this affidavit in support of an application for an Order pursuant to Title 18, United States Code, Section 2518 authorizing the interception and recording of wire communications concerning offenses enumerated in Title 18, United States Code, Section 2516--that is, offenses involving the importation, distribution of, and possession with intent to distribute controlled substances, the use of wire facilities to facilitate those offenses, the maintenance of drug-involved premises laundering the proceeds of narcotics trafficking, conspiracy to do the same, and attempts to do the same, in violation of Title 21, United States Code, Sections 841, 843, 846, 848, 856, and Title 18, United States Code, Sections 1956 and 1957 (the "TARGET OFFENSES").[1]

---

[1]     Although not a predicate offense under Title 18, United States Code, Section 2516, there is probable cause to believe that the TARGET SUBJECTS (as subsequently defined herein) have aided and abetted and are aiding and abetting those substantive offenses, in violation of Title 18, United States Code, Section

3.    For the reasons set out in this affidavit, I believe that there is probable cause to believe that the TARGET OFFENSES have been committed, are being committed, and will continue to be committed by MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," OSMEL VAZQUEZ, a/k/a "Omel," RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," WILLIAM DELGADO, a/k/a "Mejor," ARIEL PENA, a/k/a "Bin, Vin," JOSE RAMON PEREZ, KENNETH PENA, LETICIA RAPOSO, a/k/a "Leti," a/k/a "La Rubia," DEYANIRA PAULINO-GOMEZ, a/k/a "Maritza Alvarez," STALIN DOMINGO GOMEZ, CYNTHIA MEDINA, ERICK NUNEZ, and others known and unknown (the "TARGET SUBJECTS"), and that wire communications will be made using the designated telephone in furtherance of, in connection with, to facilitate, to accomplish, and to commit the TARGET OFFENSES.  Authorization is sought herein to intercept wire communications of the TARGET SUBJECTS, to and from the TARGET CELLPHONE (defined in paragraph 7 below), believed to be used by MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny."

4.    The requested Order is sought for a period of time until the interception fully reveals the manner in which the above-named individuals and their confederates participate in the above-described offenses, or for a period of thirty (30) days, whichever occurs first, pursuant to Title 18, United States Code,

_____

2.

Section 2518(5).  Pursuant to Title 18, United States Code,
Section 2518(5), it is further requested that the 30-day period
be measured from the earlier of the date on which investigative
or law enforcement officers begin to conduct interception under
this Court's Order or ten days from the date of this Court's
Order.

     5.   This case is being investigated by ICE and other
law enforcement agencies.  I have personally participated in the
investigation of the offenses referred to in paragraphs two and
three above, and make this affidavit based on my personal
participation in this investigation and based on reports made to
me by ICE agents and other law enforcement authorities.  Except
where otherwise noted, the information set forth in this
affidavit has been provided to me by other law enforcement agents
who have assisted in the investigation.  Unless otherwise noted,
wherever in this affidavit I assert that a statement was made,
the statement was made by another law enforcement officer (any of
whom may have had either direct or hearsay knowledge of that
statement) to whom I or other law enforcement officers have
spoken or whose reports I have read and reviewed.  Such
statements are reported in substance and in part, unless
otherwise indicated.  Likewise, information resulting from
surveillance sets forth either my personal observations or
information provided directly or indirectly through other law

enforcement officers who conducted such surveillance.

6.   Because this affidavit is being submitted for the limited purpose of securing an Order authorizing the interception of wire communications, I have not included details of every aspect of this investigation to date.   Facts not set forth herein are not being relied on in reaching my conclusion that Orders should be issued.   Nor do I request that this Court rely on any facts not set forth herein in reviewing this application for an Order authorizing the interception of wire communications.

### THE TARGET CELLPHONE

7.   There is probable cause to believe that MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," has been using, is using, and will continue to use the following cellular telephone a cellular telephone bearing assigned number 646-964-3580, International Mobile Subscriber Identification ("IMSI") 316010160550888, and Urban Fleet Mobile Identification ("UFMI") 176*745*7216 and subscribed in the name of "Prepaid Prepaid ," at "PO Box 55026, Irvine, CA 92619," and with service provided by SPRINT/NEXTEL (the "TARGET CELLPHONE").

8.   In particular, there is probable cause to believe that MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," and other TARGET SUBJECTS, as well as others yet unknown, are using the TARGET CELLPHONE to make wire communications in furtherance of, in connection with, to facilitate, to accomplish,

and to commit the TARGET OFFENSES. Specifically, as set forth below, RODRIGUEZ is believed to be using the TARGET CELLPHONE to arrange for the importation and sale of narcotics, including marijuana, and for the transfer and laundering of proceeds from the sale of marijuana.

9. I have been informed by other law enforcement personnel who are familiar with the applicable telephone technology that a "portable cellular telephone" (or a "mobile telephone") can be used both within a vehicle and outside a vehicle through the use of a portable battery pack. The cellular telephone system divides the New York City and other metropolitan areas into many small coverage areas, which are called "cells." As a vehicle in which a portable cellular telephone is located, or the cellular telephone itself, is moved from one cell to another, transmitters within each cell and a master switching network permit "wire communications" to be completed. Many portable cellular telephones, including the TARGET CELLPHONE, contain a removable computer chip that bears a unique IMSI or international mobile subscriber identity number and an assigned telephone number. It is requested that interception be permitted over the TARGET CELLPHONE, and any other telephone numbers accessed through the above-listed IMSI numbers for the TARGET CELLPHONE, and any IMSI numbers accessed through the phone number assigned to the TARGET CELLPHONE. In addition, it is requested

6

that background conversations, in the vicinity of the TARGET
CELLPHONE while it is off the hook or otherwise in use, also be
permitted to be intercepted.

10. In addition, the TARGET CELLPHONE utilizes a
"Direct Connect" two-way radio feature offered by SPRINT/NEXTEL,
the service provider for the TARGET CELLPHONE.  A SPRINT/NEXTEL
telephone equipped with this feature is assigned a unique
identifier, known as a UFMI number, for the purposes of this
"Direct Connect" two-way radio feature.  This application seeks
authorization to intercept Direct Connect two-way radio
communications occurring over the TARGET CELLPHONE.

11. In addition, certain cellphone service providers
are able to access and provide more precise information as to the
geographic location of their cellphones via what is known as GPS
tracking; such information is not routinely captured or recorded
by the cellphone service provider, but may be obtained
prospectively to give a "snapshot" of the location of a
particular cellphone at a particular point in time.  Accordingly,
I request that the Court direct specifically those companies that
are technologically able to do so to provide us with GPS
information (sometimes referred to as E-911 information) with
respect to the geographic location of the TARGET CELLPHONE at
particular points in time, upon the request of a member of the
investigative team.

7

12.   I also request permission for ICE to utilize an electronic homing device to help investigators locate the TARGET CELLPHONE.  This device can be programmed with the phone number or IMSI of a specific cellphone, and it will allow the operator to "home" in on signals emanating from that cellphone, without permitting the operator to intercept or record any telephonic or electronic communications.  As the operator gets closer to the cellphone, the signal becomes stronger.  Cell site, GPS, E-911, the use of an electronic homing device, cell site triangulation, and other location information will assist us in determining the locations where a particular cellphone is being used and, accordingly, will aid us in conducting surveillance and identifying our targets, their co-conspirators, and locations used by them in furtherance of the narcotics and money laundering conspiracies.

13.   Because of the mobility of portable cellular telephones, pursuant to Title 18, United States Code, Section 2518(3), authorization is requested for interception of wire communications within the Southern District of New York, and outside that jurisdiction but within the United States in the case of a mobile interception device.

14.   It is anticipated that the subjects of this investigation will use the TARGET CELLPHONE to place calls and relay messages to and from the Southern District of New York, as

8

well as other locations.  This belief is supported by the facts described below.  Pursuant to United States v. Rodriguez, 968 F.2d 130 (2d Cir.) cert. denied, 506 U.S. 847 (1992), a court in the Southern District of New York is empowered to issue an Order for the interception of wire communications over telephones located in other districts, as long as the interceptions of these communications are first heard in the Southern District of New York.

15.  In connection with the telecommunication company that provides the service for the TARGET CELLPHONE, all interceptions will automatically be routed to New York, New York, regardless of where the telephone calls are placed to or from. Accordingly, all interceptions will first be heard in the Southern District of New York.  During the requested wire surveillance, all monitoring will be performed in New York, New York, by law enforcement officers authorized under Title 18, United States Code, Section 2510(7), including special agents of ICE and government employees or individuals operating under a contract with the Government, who will be acting under the supervision of investigative or law enforcement officers authorized to conduct the interception.

<u>OBJECTIVES</u>

16.  There is probable cause to believe that the interception of wire communications, the authorization for which

9

is sought herein, will continue to help to reveal:  (i) the
nature, extent and methods of operation of the TARGET SUBJECTS'
narcotics-trafficking and money laundering business; (ii) the
identities of the TARGET SUBJECTS, their accomplices, aiders and
abettors, co-conspirators and participants in their illegal
activities; (iii) the time and place of the receipt and
distribution of contraband and money involved in those
activities; (iv) the locations and items used in furtherance of
those activities; (v) the existence and locations of records;
(vi) the location and source of resources used to finance their
illegal activities; and (vii) the location and disposition of the
proceeds from those activities.  In addition, these wire
communications are expected to constitute admissible evidence of
the commission of the TARGET OFFENSES.

### PRIOR APPLICATIONS

        17.  I have been informed that reviews have been done
of the electronic surveillance files of the United States
Immigration and Customs Enforcement, the Drug Enforcement
Administration, and the Federal Bureau of Investigation.[2]  Based

---

[2]    A check of FBI, DEA, and ICE files was completed on or about
December 30, 2009.

        In addition to the applications listed herein, a
telephone used by a "Manuel Rodriguez," date of birth unknown,
was intercepted beginning on or about August 26, 1993, pursuant
to an order signed by United States District Judge Harry Lee Roth
in the Western District of Texas.  I believe it is unlikely that
this telephone was used by MANUEL GEOVANNY RODRIGUEZ, a/k/a

on these reviews, I have been informed that there have been no prior applications for Court authorization to intercept wire, oral, or electronic communications of the TARGET SUBJECTS or over the TARGET CELLPHONE, except as follows:

a. On or about May 27, 2009, Justice Bruce Allen of the Supreme Court of the State of New York, Special Narcotics Courts, County and City of New York, authorized the interception of wire communications over a telephone believed to be used by WILLIAM DELGADO, a/k/a "Mejor," which was assigned the call number 347-698-4735, and subscribed to in the name of "Amarilis Delgado," at "77 Logan St., Fl. 2, Brooklyn, New York, 11208." Interception began on or about May 27, 2009, and was re-authorized by Justice Allen on or about June 25, 2009, on or about July 24, 2009, and on or about August 18, 2009. Interception ceased on or about September 18, 2009.

b. On or about June 25, 2009, Justice Bruce Allen of the Supreme Court of the State of New York, Special Narcotics Courts, County and City of New York, authorized the interception of wire communications over a telephone believed to be used by RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," which was assigned the call number 347-898-4848, and subscribed to in the name of "MANNY MANNY," at "147 Autumn Ave., Brooklyn, New York, 11208." Interception began

_____

"Shorty," a/k/a "Manny," as RODRIGUEZ has no known ties to Texas, and "Manuel Rodriguez" is not an uncommon name.

on or about June 25, 2009, and was re-authorized by Justice Allen on or about August 18, 2009. Interception ceased on or about September 18, 2009.

c. On or about July 20, 2009, Justice Bruce Allen of the Supreme Court of the State of New York, Special Narcotics Courts, County and City of New York authorized the interception of wire communications over a telephone believed to be used by WILLIAM DELGADO, a/k/a "Mejor," which was assigned the call number 347-626-3964, and subscribed to in the name of "DEE DEE," at "P.O. Box 54988, Irvine, California, 92619." Interception began on or about July 20, 2009, and was re-authorized by Justice Allen on or about August 18, 2009. Interception ceased on or about September 1, 2009.

d. On or about October 8, 2009, Justice Bruce Allen of the Supreme Court of the State of New York, Special Narcotics Courts, County and City of New York, authorized the interception of wire communications over three additional telephones. The telephones were: first, one telephone believed to be used by JOSE RAMON PEREZ, which was assigned the call number 646-530-5454, and subscribed to in the name of "Selio Flores," at "P.O. Box 55026, Irvine, California, 92619;" second, one telephone believed to be used by ARIEL PENA, a/k/a "Bin, Vin," and KENNETH PENA, which was assigned the call number 646-302-7739, and subscribed to in the name of "YYYYY GGGG" at "P.O.

Box 55026, Irvine, California, 92619;" and, third, one telephone believed to be used by WILLIAM DELGADO, a/k/a "Mejor," which was assigned the call number 646-302-7739, and subscribed to in the name of "DEE DEE," at "P.O. Box 54988, Irvine, California, 92619." Interception on each of these telephones began on or about October 8, 2009, and ceased on or about November 6, 2009.

       e.    On or about November 6, 2009, United States District Judge Deborah A. Batts of the United States District Court, Southern District of New York, authorized the interception of wire communications over a telephone believed to be used by OSMEL VAZQUEZ, a/k/a "Omel," which was assigned the call number 305-796-8486 and, subscribed in the name of "Silenay Valdes," at "PO Box 54988, Irvine, CA 92619" ("VAZQUEZ CELLPHONE-5"), and a telephone also believed to be used by OSMEL VAZQUEZ, a/k/a "Omel," which was assigned the call number 305-796-1632, and subscribed in the name of "Pinde Venereo" at "5912 Southwest 11th Street, West Miami, FL 33144" ("VAZQUEZ CELLPHONE-7"). Interception on both phones began on or about November 6, 2009, and ceased on December 5, 2009.

       f.    On or about November 12, 2009, Justice Bruce Allen of the Supreme Court of the State of New York, Special Narcotics Courts, County and City of New York, authorized the interception of wire communications over two additional telephones. The telephones were: first, one telephone believed

13

to be used by JOSE RAMON PEREZ, which was assigned the call number 786-412-7904, and subscribed to in the name of "Luis Enrique" at "PO Box 54988, Irvine, CA 92619"; second, one telephone believed to be used by KENNETH PENA, which was assigned the call number 347-321-5805 and subscribed to in the name of "YYYYY GGGG" at "PO Box 55026, Irvine, California, 92619." Interception on the telephone assigned call number 347-321-5805 began on or about November 12, 2009, and continues through the date of this affidavit. The telephone assigned call number 786-412-7904 was determined to no longer be active at around the time interception was to commence; accordingly, no calls have been intercepted over that phone. Interception of the phone assigned call number 347-321-5805 ceased on or about December 11, 2009.

      g.  On or about November 16, 2009, United States District Judge John F. Keenan, Southern District of New York, authorized the interception of wire communications over a telephone believed to be used by OSMEL VAZQUEZ, a/k/a "Omel," which was assigned the call number 305-345-0580, and subscribed in the name of "Yenelis Jimenez," "PO Box 54988, Irvine, CA 92619" ("VAZQUEZ CELLPHONE-8").  Interception on the phone ceased on or about December 15, 2009.

I.    <u>THERE IS PROBABLE CAUSE TO BELIEVE THAT THE TARGET SUBJECTS WILL USE THE TARGET CELLPHONE IN FURTHERANCE OF THE TARGET OFFENSES</u>

A.    Background of the Investigation

18.   Since at least in or about February 2009, the ICE
Special Agent in Charge and other agencies have been
investigating a narcotics trafficking and money laundering
organization which distributes multi-kilogram amounts of
marijuana and possibly other narcotics throughout the greater New
York City area (the "Organization").  Since in or about that
time, ICE and other law enforcement agencies have been
investigating MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a
"Manny," OSMEL VAZQUEZ, a/k/a "Omel," RICHARD JIMENEZ-PEREZ,
a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," WILLIAM
DELGADO, a/k/a "Mejor," ARIEL PENA, a/k/a "Bin, Vin," JOSE RAMON
PEREZ, KENNETH PENA, LETICIA RAPOSO, a/k/a "Leti," a/k/a "La
Rubia," DEYANIRA PAULINO-GOMEZ, a/k/a "Maritza Alvarez," STALIN
DOMINGO GOMEZ, CYNTHIA MEDINA, ERICK NUNEZ, and others known and
unknown for the importation and distribution of narcotics in the
New York City area.  RODRIGUEZ, in particular, is believed to be
operating in the greater New York City area, and to control
multiple distribution points throughout, at least, the Washington
Heights and Inwood neighborhoods.

19.   The prior applications for authorization to
intercept wire communications occurring over eleven cellular
telephones used by OSMEL VAZQUEZ, a/k/a "Omel," WILLIAM DELGADO,
a/k/a "Mejor," RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado,"

a/k/a "Javier Ramirez-Santiago," JOSE RAMON PEREZ, ARIEL PENA, a/k/a "Bin, Vin," and KENNETH PENA, which are referenced above in Paragraphs 17(a) through 17(g), set forth the probable cause existing at the relevant time period to believe those subjects were using the target cellphones set forth in those applications in furtherance of the target offenses set forth in those applications.

20. As part of the investigation in this case, law enforcement has engaged in several seizures of narcotics and narcotics proceeds, some of which are summarized infra. Additionally, the previous wire intercepts over the telephone used by KENNETH PENA, described in Paragraph 17(f) above, have revealed that MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," is engaging in narcotics trafficking and money laundering.

21. Based on the investigation to date, the principal TARGET SUBJECTS are as follows:

a. MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny": RODRIGUEZ is believed to be a marijuana trafficker based in New York. I believe that his principal role in the Organization is to distribute marijuana in the New York City area, and that he controls several locations where workers affiliated with him sell marijuana on his behalf.

16

b.   OSMEL VAZQUEZ, a/k/a "Omel": VAZQUEZ is believed to be a marijuana trafficker based in Florida.  I believe that his principal role in the Organization is to direct the transportation of marijuana from drug sources in Florida to distributors in the New York City area. On or about July 25, 2007, VAZQUEZ was arrested by the Miami-Dade County Police Department in Florida on a charge of felony possession of cocaine.  According to criminal history records, on or about September 17, 2008, a <u>nolle prosequi</u> was filed with respect to the charge by the Florida State Attorney's Office.

c.   RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago": JIMENEZ-PEREZ is believed to be a marijuana trafficker based in New York City.  I believe that his principal role in the Organization is to distribute marijuana in the New York City area.

d.   WILLIAM DELGADO, a/k/a "Mejor": DELGADO is believed to be a marijuana trafficker based in New York City.  I believe that his principal role in the Organization is to distribute marijuana in the New York City area.

e.   JOSE RAMON PEREZ: PEREZ is believed to be a marijuana trafficker based in New York City.  I believe that his principal role in the Organization is to distribute marijuana in the New York City area.  According to criminal history records, on or about July 21, 1998, in Kings County Supreme Court, New

17

York, PEREZ was convicted, upon a plea of guilty, to criminal possession of a narcotic drug in the fourth degree, a class C felony, and was sentenced to five years' probation.

       f.    KENNETH PENA: KENNETH PENA is believed to be a marijuana trafficker based in New York City. I believe that his principal role in the Organization is to distribute marijuana in the New York City area.

       g.    ARIEL PENA, a/k/a "Bin, Vin": ARIEL PENA is believed to be a marijuana trafficker based in New York City. I believe that his principal role in the Organization is to distribute marijuana in the New York City area.

       **Selected Calls Intercepted On A Telephone Used By KENNETH PENA Establish That MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," Uses The TARGET CELLPHONE To Commit The TARGET OFFENSES**

       22.   Telephone conversations between MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," using the TARGET CELLPHONE, and KENNETH PENA, using a telephone assigned the call number 347-321-5805, were intercepted pursuant to the application summarized in Paragraph 17(f), above. Those telephone calls include the following:

       a.    On or about November 24, 2009, at approximately 1:35 p.m., MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," placed a telephone call to KENNETH PENA. In that conversation, they discussed, in substance and in part, a delivery of marijuana and the prices for the next transaction.

RODRIGUEZ told PENA that the price would be approximately the same price as established in prior transactions: "If you want, I'll do it like last time.  Understand?  So you can feel good.  But it's not less than that."  RODRIGUEZ also told PENA that RODRIGUEZ spoke with PENA's brother, who agents have identified as ARIEL PENA, a/k/a "Bin, Vin."[3]  RODRIGUEZ also told PENA, "I don't think we have to do the same as last time because they are the same.... [T]hey are the same as the others.... I'm telling you, it's better."  Based on my training and experience, I understand to mean that PENA did not need to view the marijuana to determine its quality, as it was the same quality, or even better quality, as the last batch.  PENA agreed, responding, "Okay, okay.  So we don't have to do the same; that will be passed and that's it."  PENA also told RODRIGUEZ, "You know, your word is gold," which, based on my training and experience, I understood to mean that PENA trusted RODRIGUEZ.  RODRIGUEZ also reassured PENA, and told him, "I'm not going to start speaking shit and then I look bad."  They then arranged where they will meet.

       b.   On or about December 3, 2009, at approximately 2:30 p.m., KENNETH PENA placed a telephone call to ARIEL PENA, a/k/a "Bin, Vin" ("ARIEL PENA").  In that call, ARIEL

---

[3]     In a telephone conversation between RODRIGUEZ and PENA that was intercepted on November 20, 2009, at approximately 5:30 p.m., PENA introduced himself as "Bin's brother"

PENA told PENA, "You need to meet up with that nigga Shorty."[4]
PENA replied that PENA "didn't even collect [money from his
distributors] yesterday."  ARIEL PENA replied, "Damn, man.  I
told you. You behind with that nigga B[5] [RODRIGUEZ]."  Based on
my review of this and other telephone calls, the knowledge I have
gained over the course of the investigation, and my training and
experience, I understood this to refer to payment for a previous
transaction, as the PENA brothers were behind on payments they
owed to RODRIGUEZ.

        c.    On or about December 3, 2009, at
approximately 4:14 p.m, PENA placed a telephone call to
RODRIGUEZ.  In that conversation, PENA told RODRIGUEZ "I am
putting everything together of what I got.  Once I put it
together, I will call you...."  On the same date at approximately
5:49 p.m., PENA again called RODRIGUEZ, and stated, "I'm waiting
for some dude right now to complete everything so I won't short
you.  I have 25 [$25,000] right now and some dude is going to
give me money, and I will complete everything right there."  PENA
told RODRIGUEZ that PENA would call him "right after he gives me
the money... Once he gives me that money, I will call you to meet

---

[4]    I have learned through intercepted conversations and from
the course of the investigation that "Shorty" refers to
RODRIGUEZ.  According to his driver's license, RODRIGUEZ is
approximately 5 feet, seven inches tall.  (See also Paragraph

[5]    In my training and experience, "B" is slang meaning
essentially "friend," somewhat similar to other slang such as
"bro," "son," "kid," "man," or "dog."

with you." Based on my training and experience, I understood this to mean that PENA had some of the money owed RODRIGUEZ, but was trying to obtain additional funds from another person. Additionally, I believe that this conversation, like the conversation summarized in 22(b), refers to moneys owed RODRIGUEZ for prior marijuana transactions. RODRIGUEZ told PENA that RODRIGUEZ would be near Broadway and "80 something," and asked to meet PENA in that vicinity.

        d.   On or about December 3, 2009, at approximately 6:05 p.m., PENA placed a telephone call to RODRIGUEZ. In that conversation, PENA told RODRIGUEZ that the "dude" who was going to give him money was "taking a long time," and that PENA would just "give [RODRIGUEZ] what I have here. Then when he give me that, I'll give it to you." RODRIGUEZ stated that he was "going to be on 82 and Amsterdam," and the men agreed to meet in that area. In additional conversations around the same time, PENA and RODRIGUEZ continued discussing exactly where they would meet.

### The December 3, 2009 Seizure

23.   As a result of the telephone conversations summarized in paragraph 22 above, ICE Special Agents learned that KENNETH PENA was planning to deliver approximately $25,000 in marijuana proceeds to MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty,"

a/k/a "Manny," in the Upper West Side of New York, New York, and set up surveillance in that vicinity.

24.  On or about December 3, 2009, at approximately 6:20 PM, ICE Special Agents, including the undersigned, observed KENNETH PENA, speaking with MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," in the vicinity of 80th Street and Amsterdam Avenue in New York, New York.  Agents observed PENA shake RODRIGUEZ's hand, cross Amsterdam Avenue, and enter a black Mercedes Benz with New York license plate EFM 9607[6] (the "Mercedes").  PENA then drove north on Amsterdam Avenue and agents lost sight of his vehicle.  Around that time, at least one ICE special agent observed RODRIGUEZ paying for a muni-meter receipt in the vicinity of where he was speaking with PENA.

25.  Later the same day, in the same vicinity, agents saw MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," leave a restaurant with an unknown man (the "UM").  The UM entered a red Honda with Florida license plate 272 WWD[7] and drove north on Amsterdam Avenue where agents lost sight of the vehicle. RODRIGUEZ entered a gray Toyota Highlander with New York license

---

[6]    The Mercedes was determined to be registered to "Kenneth O. Pena," residing at 539 West 160 Street, Apt 3A, New York, New York.

[7]    The Honda was determined to be registered to "Melissa Sancy," date of birth June 13, 1971, residing at 6500 Main Street, Apt 302, Hialeah, Florida.

plate EJU 3621[8] (the "Toyota").  RODRIGUEZ drove north on

Amsterdam and made a left turn on to 81st Street and continued

East and then made a left turn onto West End Avenue where ICE

Special Agents, including the undersigned, performed a vehicle

stop at approximately 7:20 p.m.

26.  MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a

"Manny," provided a New York driver's license number that had the

number 312582617 in the name "Manuel G. Rodriguez" residing at

"81 Pondfield Road, Bronxville, New York," and reflected that he

was 5 feet, 7 inches tall.  RODRIGUEZ made statements to the

agents, including the following:

a.  RODRIGUEZ had just had dinner with a friend

before he was pulled over; and

b.  RODRIGUEZ works in real estate in both New

York and Florida.

27.  On the same day, at approximately 7:35 p.m., ICE

Special Agents decided to search the Toyota, as the intercepted

telephone conversations, some of which are summarized in

Paragraphs 22(b-d), and physical surveillance provided probable

cause to believe that the Toyota contained contraband.  I found a

black plastic bag on the rear driver's side floor, which was

determined to contain bundled United States currency (the

---

[8]   The Toyota was determined to be registered to "Manuel G.
Rodriguez," date of birth October 26, 1972, residing at 81
Pondfield Road, Bronxville, New York.

"Currency"). After the currency was discovered, MANUEL GEOVANNY
RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," gave an additional
statement, which included the following:

        a.   RODRIGUEZ is a partial silent owner of a
restaurant in the Dykman area [referring to a street named
Dyckman, which is located in the New York, New York neighborhood
of Inwood] and the money was from the restaurant;

        b.   The money is "legit"; and

        c.   RODRIGUEZ is friends with a man named
Fernando Mateo, who is the President of the New York State
Federation of Taxi Drivers.

        28.  On the same day, at approximately 7:45 p.m.,
MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," was
informed that the currency was being seized and processed by ICE.
He was provided with the appropriate forms, notified that he
would receive a notice from the agency within 60 days to the
address he provided, and he was released.

        29.  On or about the same evening, the Currency was
transported to the SAC/NY Office and counted.  A preliminary
count of the Currency revealed that it was approximately $25,000.

    II.   TOLL ANALYSIS OF THE TARGET TELEPHONE

        30.  In connection with this investigation, law
enforcement officers have analyzed toll records for the TARGET
CELLPHONE. Those records indicate that the account for the TARGET

24

CELLPHONE has been open since September 12, 2009, and toll records on TARGET CELLPHONE-1 have indicated active use since at least on or about that same date.

31. The TARGET CELLPHONE has been in contact with the telephone assigned the call number 347-321-5805 ("347-321-5805"), which was previously intercepted (as described in Paragraph 17(f)), some of which calls are summarized in Paragraph 22, above, approximately 31 times from November 12, 2009 through December 18, 2009.  It is believed that 347-321-5805 is being used by KENNETH PENA, a known marijuana trafficker as set forth in paragraphs 22 and 23 above.  According to toll records for 347-321-5805, the most recent call between 347-321-5805 and the TARGET CELLPHONE was on or about December 16, 2009.

32. The TARGET CELLPHONE has also been in contact with the telephone assigned the call number 917-578-9528 ("917-578-9528"), which has not been intercepted as of the date of this application, approximately 114 times from October 19, 2009 through December 16, 2009.  It is believed that 917-578-9528 is being used by ARIEL PENA, a/k/a "Bin, Vin," a known marijuana trafficker as set forth in paragraphs 22 and 23 above.  According to toll records for 917-578-9528, the most recent call between 917-578-9528 and the TARGET CELLPHONE was on or about December 16, 2009.

33.   The TARGET CELLPHONE has also been in contact with
the telephone assigned the call number 917-365-5148 ("917-365-
5148") , which has not been intercepted as of the date of this
application, approximately five times from September 13, 2009
through December 18, 2009.   The telephone assigned the number
917-365-5148 is believed to be used by FNU LNU, a/k/a "Conejo."
"Conejo" was previously intercepted on 917-365-5148 talking with
JOSE RAMON PEREZ, who was using 646-530-5454, which was
previously intercepted in the order described in Paragraph 17(d).
In a telephone conversation intercepted on or about October 11,
2009, at approximately 1:13 p.m., "Conejo" called PEREZ to
discuss obtaining marijuana from him.   PEREZ told "Conejo" that
PEREZ "sent 80 [80 pounds of marijuana] for you."   PEREZ added
that "the one that arrives today, are eighty for you which the
little friend is bringing," meaning that a marijuana trafficker
was bringing 80 pounds of marijuana the date of the conversation.
"Conejo" asked "so, I will see the little friend tonight?"   PEREZ
confirmed: "Tonight, and there is no doubt."

III. <u>ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR
APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE
INTERCEPTION OF WIRE COMMUNICATIONS OVER THE TARGET
CELLPHONE</u>

34.   Among the principal goals of this continuing
investigation is to gather evidence and more fully identify the
TARGET SUBJECTS, the nature of their narcotics trafficking, the
narcotics suppliers they work for and with, their customers and

affiliates, and to continue to track the locations of targets, narcotics, and narcotics proceeds so that law enforcement agents can effectively conduct arrests and seizures.  As indicated below, several other investigative techniques have been tried, or reasonably appear likely to fail if tried, or are likely to be too dangerous to employ.  Accordingly, there is a compelling need in this case for wire surveillance of the TARGET CELLPHONE.

## PHYSICAL SURVEILLANCE

35.  A significant amount of physical surveillance of certain of the TARGET SUBJECTS has been performed in this investigation.  This surveillance included surveillance of what are believed to have been multiple truck deliveries of marijuana in the vicinity of Diamond Street and Calyer Street in Brooklyn, New York, which resulted in the seizure of over 87 pounds of marijuana.  Law enforcement officers have conducted physical surveillance during the course of the investigation (and will continue to do so).  Since in or about early December 2009 until the present, I and other agents have engaged in surveillance of MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," and others known and known, on approximately two occasions, and attempted to surveil him four additional times, in the greater New York area.  As set forth in Paragraphs 22-29, one surveillance resulted in a seizure of approximately $25,000. However, attempts to surveil at and near the location of the

address listed on RODRIGUEZ's license on or about December 29, 30, and 31 were unsuccessful as RODRIGUEZ was not seen.

36.   It appears while MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," will pick up money, he generally does not pick up marijuana or other narcotics himself.  Accordingly, surveillance of RODRIGUEZ is unlikely to reveal the location of narcotics, but we may learn where narcotics are located by intercepting telephone conversations between him and his co-conspirators.  Additionally, while photographs from surveillance may help cooperating witnesses identify members of the organization, the surveillance does not otherwise further the investigation, if it is not accompanied by knowledge of the discussions of the individuals being surveilled.

37.   Physical surveillance alone has thus not allowed us to learn the full and specific nature of the activities of MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," and others with whom he may be working to traffic in narcotics.[9] Generally speaking, physical surveillance in and of itself is useful mainly in generating information concerning the identity of an individual, where he or she resides, locations he or she frequents, and the identities of the persons with whom he or she

---

[9]   Additionally, law enforcement has conducted physical surveillance of a "stash house" in New York, New York, as described more fully in paragraph 45.  That surveillance has not yielded the information that I believe can be obtained through surveillance of the TARGET CELLPHONE.

28

meets.  It provides limited direct evidence of the significance
of the meetings, however.  Thus, without wire surveillance to
assist agents in understanding the purpose of various meetings
and facilitating discrete surveillance, physical surveillance is
expected to be of limited utility.

38.  It is expected that the information that can be
obtained from the interception of wire communications over the
TARGET CELLPHONE will help law enforcement agents locate the
identified TARGET SUBJECTS and continue to identify additional
TARGET SUBJECTS, particularly those who are affiliated with
MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," and
thereby enhance the prospects for fruitful physical surveillance.
In addition, with the knowledge provided beforehand by wire
surveillance that a meeting is to take place at a given location,
or that proceeds or narcotics will travel over a certain route,
it may be possible to establish physical surveillance at that
location or on that route in advance, thus minimizing the risks
of discovery inherent in following subjects or remaining at
target locations for extended periods of time.

39.  Intercepting communications to and from the TARGET
CELLPHONE will provide direct evidence of communications between
the TARGET SUBJECTS and other conspirators and assist in
identifying TARGET SUBJECTS, including suppliers of narcotics to
the TARGET SUBJECTS; locations from which they conduct their

29

activities and store cash and narcotics; and additional narcotics customers of the TARGET SUBJECTS--information that surveillance to date has not fully revealed.

### TELEPHONE RECORDS

40.   Telephone toll records, although they have been used and are continuing to be used in this investigation, provide only limited information; these methods will not enable law enforcement to identify with certainty the persons involved in committing the TARGET OFFENSES.  We believe that the subscriber names and addresses for many of the phone numbers identified thus far in this investigation, including the TARGET CELLPHONE and phone numbers that were the subject of relevant prior wire applications, are fictitious.  Consequently, to date, law enforcement has not been able to fully identify many of the members of the organization, who are in the process of arranging and participating in these drug-trafficking transactions through phone communications.  Moreover, toll records, unlike the interceptions requested herein, do not provide real-time evidence of the content of communications, which are an essential tool not only in providing opportunities to identify the organization's members and interdict its activities, but also to be used as evidence of the commission of those activities.  It is only through the combination of wire surveillance, visual surveillance, and other investigatory tools that the agents

30

expect to identify fully the nature and scope of the
organization, including the identities of the individuals who are
connected to the conspiracy.

<u>PRIOR WIRE SURVEILLANCE</u>

41.   Prior wire surveillance on telephones that were
used by WILLIAM DELGADO, a/k/a "Mejor," RICHARD JIMENEZ-PEREZ,
a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," JOSE
RAMON PEREZ, KENNETH PENA, and OSMEL VAZQUEZ, a/k/a "Omel,"
provide only historical information.  Wire surveillance of the
TARGET CELLPHONE will help us determine from whom the TARGET
SUBJECTS are continuing to obtain narcotics, will help identify
additional targets, and will help us determine when new shipments
of narcotics are expected.  The above-described prior wire
surveillance thus far has revealed a significant marijuana
distribution network in New York City and a transportation cell
from Florida to New York that is supplying at least some members
of the marijuana distribution network.  That prior surveillance,
however, has not revealed the identities of the drivers and full
extent of the activities of the transportation cell.  In
addition, the prior surveillance has not revealed the drug
sources from whom the transportation cell obtains the marijuana.
Based on the prior wire surveillance, we believe that MANUEL
GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," has direct
access to at least some of these marijuana sources and may be

31

communicating directly with them.   Accordingly, through
surveillance of the TARGET CELLPHONE, we expect to learn, among
other things, the identities and/or locations of the sources of
the marijuana being transported to New York City and the manner
in which RODRIGUEZ obtains the marijuana from these sources.

### USE OF UNDERCOVER OFFICERS

42.  At present, there is no expectation that an
undercover officer will be able to be introduced into the
organization or to determine the full scope of the TARGET
SUBJECTS' operations, meet and identify all of the other TARGET
SUBJECTS and their co-conspirators, or identify the TARGET
SUBJECTS' narcotics suppliers and their confederates.  Based on
my experience as a narcotics investigator, I believe that drug
traffickers are unlikely to discuss the full extent of their
organization's activities or membership when dealing with an
"outsider" such as an undercover officer.  In my experience,
narcotics traffickers are usually highly reticent about
discussing narcotics with unknown persons.  Even if an undercover
officer can subsequently be introduced to MANUEL GEOVANNY
RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," no undercover officer
is likely to be aware of the full scope of the activity of the
TARGET SUBJECTS, the identities of all of the TARGET SUBJECTS,
nor all the detailed methods by which the TARGET SUBJECTS operate
their narcotics organization.  Specifically, the undercover

officer would not be able to dictate the timing of the shipments of money or narcotics, or have a say in how the money or narcotics are moved. Accordingly, the use of undercover officers at this time is not available as an alternative technique to wire surveillance of the TARGET CELLPHONE.

### USE OF CONFIDENTIAL INFORMANTS

43. The investigation into the TARGET SUBJECTS has not involved the use of confidential sources. I have learned that a defendant in the Southern District of New York has provided information about MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny." However, this defendant is incarcerated and is, for that reason and others (some of which are related to his incarceration), unlikely to be able to obtain current information about RODRIGUEZ.

44. There is currently no expectation, in any event, that any confidential source would be able to determine the full scope of the TARGET SUBJECTS' operations, meet and identify all of the other TARGET SUBJECTS and their co-conspirators, or identify the TARGET SUBJECTS' narcotics suppliers and their confederates. Accordingly, wire surveillance is necessary to learn more about the TARGET SUBJECTS and how they operate.

### FEDERAL GRAND JURY

45. Use of a federal grand jury does not appear to be a promising method of investigation. While certain documents,

33

such as bank records, could be obtained through grand jury subpoena, the grand jury process is unlikely to be useful in developing evidence concerning the TARGET SUBJECTS and the internal operations of the narcotics-trafficking enterprise. Witnesses who could provide additional relevant evidence to a grand jury have not been identified or would themselves be participants in the narcotics trafficking activities under investigation. Such individuals would face prosecution themselves; it is unlikely therefore that any of them would testify voluntarily. Nor would it be desirable at this time to seek immunity for such individuals and to compel their testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes. The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation. For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation. Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking activities under investigation.

### SEARCH WARRANTS AND SEIZURES

46. We have executed one search warrant, which revealed the presence of narcotics and narcotics proceeds at a

"stash house" located in New York, New York.  On or about October
22, 2009, we searched a stash house located at 175 Pinehurst
Avenue, New York, New York that ARIEL PENA, a/k/a "Bin, Vin," is
believed to control (the "Stash Location").[10]  The search of
Stash Location revealed approximately $76,672 in marijuana
proceeds, some of which was grouped in rubber bands on a table,
and approximately 22 pounds of marijuana inside a closet.  No one
was present at the Stash Location at the time of this search and
no one was arrested in connection with the seizure of the
marijuana and marijuana proceeds.

47.  Applications for search warrants for other
locations are generally not appropriate at this stage of the
investigation, as many of the locations where the TARGET SUBJECTS
conduct their narcotics-trafficking have not been fully
identified, and, therefore, there is insufficient information
available at this time to support the application for a search
warrant.  Additionally, a search of certain locations is certain
to alert the TARGET SUBJECTS to this investigation and may cause
them to flee or to destroy evidence.

48.  Additionally, as set forth in Paragraphs 22-29
above, we seized approximately $25,000 from MANUEL GEOVANNY

---

[10]    Other co-conspirators, including WILLIAM DELGADO, a/k/a
"Mejor," and RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado," a/k/a
"Javier Ramirez-Santiago," have been seen entering the Stash
Location and/or receiving or dropping off items outside of the
Stash Location.

RODRIGUEZ, a/k/a "Shorty," a/k/a "Manny," on or about December 3, 2009. I believe that further seizures of funds from RODRIGUEZ, if we were able to somehow establish probable cause to believe that he possessed marijuana proceeds, may imperil the investigation, as RODRIGUEZ and other TARGET SUBJECTS may modify their activities in response to the seizures. Accordingly, I believe that further seizures are not an appropriate investigative tool at this stage of the investigation.

### ARRESTS

49. Arrests of individuals in this organization are not appropriate at this stage of the investigation. For example, on or about November 11, 2009, JOSE RAMON PEREZ was stopped by officers in the Miami-Dade, Florida area, in a traffic stop unrelated to this investigation. PEREZ did not make any statements to law enforcement officers after this arrest, but ceased using the telephone number he had been using. Other TARGET SUBJECTS also changed their telephone numbers soon after the arrest of PEREZ. Because of this situation and my general experience with narcotics traffickers and money launderers, I believe that were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize

36

the investigation.  Accordingly, the risks of failure in
attempting to obtain these targets' cooperation at this stage of
the investigation greatly outweigh any likely benefits, and make
that investigative technique unavailable.

### MINIMIZATION

50.  All monitoring of wire communications over the
TARGET CELLPHONE will be minimized in accordance with Chapter 119
of Title 18, United States Code.

51.  The "investigative or law enforcement officers of
the United States" and translators, if necessary, who are to
carry out the requested interception of wire communications, will
be instructed concerning the steps they should take to avoid
infringing upon any attorney-client privilege or other recognized
privileges.  In addition, all communications intercepted will be
conducted in such a way as to minimize the interception of
communications not otherwise criminal in nature or subject to
interception under Chapter 119, Title 18, United States Code.
All monitoring will cease when it is determined that the
monitored conversation is not criminal in nature.  Interception
will be suspended immediately when it is determined through voice
identification, physical surveillance, or otherwise, that neither
the TARGET SUBJECTS or any of their confederates, when
identified, are participants in the conversation, unless it is
determined during the portion of the conversation already

37

overheard that the conversation is criminal in nature.   If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

52.  It is requested that the Order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications.   Certain subjects of this investigation are expected to communicate with each other in Spanish.   It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications.   All such translators will be under contract to ICE and will be directly supervised by ICE.   It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

## AUTHORIZATION REQUEST

53.  Based on the foregoing, it is my opinion that the interception of wire communications occurring over the TARGET CELLPHONE, as specified above, is essential to uncover the full scope of the illegal activity described herein.

54.  Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet

unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier.  The 30-day period shall be measured from the earlier of the date on which investigative or law enforcement officers begin to conduct interception under this Court's Order or ten days from the date of this Court's Order.

55.  Pursuant to the provisions of Title 18, United States Code, Section 2518(4), it is requested that it be ordered that SPRINT/NEXTEL, the service provider for the TARGET CELLPHONE, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as that provider accord the persons whose communications are to be intercepted (including all dial digits, incoming and outgoing calls, pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise).  It is further requested that the service provider maintain service to the TARGET CELLPHONE for the period of interception and any extensions thereto.  The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be

processed for payment by ICE.

56.   IT IS FURTHER REQUESTED that this affidavit, as it reveals an ongoing investigation, be sealed until further Order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

JASON SAMUELS
SPECIAL AGENT
IMMIGRATION AND CUSTOMS ENFORCEMENT
DEPARTMENT OF HOMELAND SECURITY

Sworn to before me this
7th day of January, 2010

HONORABLE GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE, PART I
SOUTHERN DISTRICT OF NEW YORK