UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNDER SEAL

IN THE MATTER OF THE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO CONTINUE INTERCEPTING
WIRE COMMUNICATIONS OCCURRING OVER A
CELLULAR PHONE BEARING ASSIGNED CALL
NUMBER 718-374-7838, IMSI NUMBER
316010165747046, AND UFMI NUMBER
173*167*8879 ("TARGET CELLPHONE-12")

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
AUTHORIZATION TO
CONTINUE INTERCEPTING
WIRE COMMUNICATIONS

STATE OF NEW YORK          )
COUNTY OF NEW YORK         ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

JASON S. SAMUELS, a Special Agent with the United
States Department of Homeland Security, Immigration & Customs
Enforcement ("ICE"), being duly sworn, deposes and states:

### INTRODUCTION

1.   I am an "investigative or law enforcement officer
of the United States" within the meaning of Section 2510(7) of
Title 18, United States Code, that is, an officer of the United
States who is empowered by law to conduct investigations of and
to make arrests for offenses enumerated in Section 2516,
Title 18, United States Code.  I have been employed as a Special
Agent with ICE since January 2002.  From 1997 through 2001, I
worked as a United States Customs Inspector at J.F.K. Airport,
and was assigned to the passenger processing branch.  During the
course of my career, I have conducted numerous investigations of
unlawful drug distribution in violation of state and federal
narcotics laws, and have conducted or participated in wire and

1

h. On or about August 27, 2010, at approximately
5:51 p.m., RODRIGUEZ received a call from JIMMY LOPEZ, a/k/a
"Chuck," who was using the telephone number 646-541-0188.  During
that call, LOPEZ stated, "I'm here again with the same people
with a different one.  Everyday we'll have different ones.  The
guys brought 8 different ones."  RODRIGUEZ responded, "One of
those strange things?"  LOPEZ then stated, "Yeah, it looks
greenish."  Later that same date, approximately 8:59 p.m.,
RODRIGUEZ called LOPEZ.  During that call, LOPEZ advised
RODRIGUEZ, "It looks nice.  They were saying 200."  I believe
that during these calls, LOPEZ is telling RODRIGUEZ that LOPEZ's
marijuana sources have 8 different types of marijuana available
and that they are offering RODRIGUEZ 200 pounds of marijuana.

### III. ALTERNATIVE INVESTIGATIVE PROCEDURES HAVE BEEN TRIED OR APPEAR UNLIKELY TO SUCCEED IF TRIED; THERE IS A NEED FOR THE CONTINUED INTERCEPTION OF WIRE COMMUNICATIONS OVER TARGET CELLPHONE-12

49.  Among the principal goals of this continuing
investigation is to gather evidence and more fully identify the
TARGET SUBJECTS, the nature of their narcotics trafficking, the
narcotics suppliers they work for and with, their customers and
affiliates, and to continue to track the locations of targets,
narcotics, and narcotics proceeds so that law enforcement agents
can effectively conduct arrests and seizures.  As indicated
below, several other investigative techniques have been tried, or
reasonably appear likely to fail if tried, or are likely to be

71

too dangerous to employ.  Accordingly, there is a compelling need
in this case for wire surveillance of TARGET CELLPHONE-12.

### PHYSICAL SURVEILLANCE

50.  A significant amount of physical surveillance of
certain of the TARGET SUBJECTS has been performed in this
investigation.  This surveillance included surveillance of what
are believed to have been multiple truck deliveries of marijuana
in the vicinity of Diamond Street and Calyer Street in Brooklyn,
New York, which resulted in the seizure of over 87 pounds of
marijuana in August 2009 from a tractor trailer driven by ADEL
SANTANA, a/k/a "Adel Santana-Zamora."  Law enforcement officers
have conducted physical surveillance during the course of the
investigation (and will continue to do so).  Since in or about
early December 2009 until the present, I and other agents have
engaged in surveillance of RODRIGUEZ and others known and known,
a number of times, and have attempted to surveil them on
additional occasions.  For example, as set forth in Paragraphs 21
through 27, one surveillance resulted in a seizure of
approximately $25,000.  Attempts to surveil at and near the
location of the address listed on RODRIGUEZ's license on or about
December 29, 30, and 31, 2009 were unsuccessful as RODRIGUEZ was
not seen.  In addition, as set forth in Paragraphs 29 through 32,
surveillance efforts on January 11, 2010, appear to have caused
RODRIGUEZ to stop using RODRIGUEZ CELLPHONE-1.  Since
approximately that time, ICE agents have surveilled RODRIGUEZ

72

many additional times, with varying results, including: (1) on or about March 4, 2010, in the vicinity of 216th Street and Broadway, New York, New York; (2) on or about March 5, 2010, at JFK Airport upon learning that RODRIGUEZ was arriving from Fort Lauderdale into JFK on a Jetblue flight; (3) on or about March 28, 2010, at the Talay night club at 701 West 135th Street, New York, New York; (4) on or about April 6, 2010, at a suspected "stash house" located at 5400 Fieldston Road, Bronx, New York (although RODRIGUEZ was not present at the house); (5) on or about May 25, 2010, speaking with MATTHEW SANTIAGO in the Bronx; (6) on or about May 26, 2010, meeting with RICHARD JIMINEZ-PADILLA, a/k/a "Gordo," in the Bronx; (7) on or about May 28, 2010, walking and speaking in the Bronx first with JOSE QUINTERO, a/k/a "Gordo," and then, later in the day, with DANIEL VALDEZ; and (8) on or about June 11, 2010, entering and leaving the home of JIMMY LOPEZ, a/k/a "Chuck," in Queens, New York. Additionally, since approximately June 2010, agents have surveilled RODRIGUEZ approximately 30 times, and have seen him meeting with various other co-conspirators, including LOPEZ and KAREEM BURKE, including on or about both August 17 and 18, 2010, when agents observed RODRIGUEZ meet BURKE in the vicinities of 181st Street and Fort Washington Avenue and 176th Street and Broadway, respectively. I believe, based in part on the conduct summarized in Paragraphs 29 through 32, and on conversations that have been intercepted during the course of this investigation,

that RODRIGUEZ is extremely surveillance-conscious and that more frequent attempts at surveilling RODRIGUEZ run a high risk of compromising the investigation (or will at least cause RODRIGUEZ to drop his phones).

51. In addition, agents have conducted visual surveillance of VIEJO on several occasions, with varying results, beginning on or about March 10, 2010. Since then, agents unsuccessfully attempted to surveil VIEJO twice during the week of March 22, 2010; surveilled him in the vicinity of the Bronx Terminal Market in the Bronx on or about April 26, 2010; surveilled him in the vicinity of 139th Street and Bruckner Boulevard, Bronx, New York, or on about May 17, 2010; surveilled him on May 19, 2010 meeting with a marijuana customer or worker; and surveilled him on or about June 10 and June 11, 2010, meeting and exchanging bags with JIMMY LOPEZ, a/k/a "Chuck." Since approximately June 10, 2010, agents have surveilled VIEJO approximately ten additional times, and have seen him meet with marijuana customers and truck drivers in Manhattan and the Bronx.

a. During the April 26 surveillance, VIEJO was seen meeting with the driver of a tractor trailer near the Bronx Terminal Market. I believe, based on his surveillance of that meeting, that the driver of that trailer was ADEL SANTANA, a/k/a "Adel Santana-Zamora," from whom approximately 87 pounds of marijuana was seized in August 2009.

74

b.    During the May 17 surveillance, ICE agents observed the driver of a tractor trailer (the "Trailer") meet with VIEJO approximately two times in the vicinity of 139th Street and Bruckner Boulevard, Bronx, New York.  Based on telephone conversations intercepted over TARGET CELLPHONE-9 (646-533-1136), I believe that during the meeting with the driver of the Trailer, VIEJO first picked a quantity of marijuana and then later returned with approximately $112,000 which he gave to the Trailer's driver.[13]  On or about the same day, ICE agents followed the Trailer throughout the day through New York, New Jersey, Pennsylvania, and Delaware.  New York-based ICE agents coordinated with ICE agents in Baltimore, Maryland.  Agents from ICE-Baltimore then provided information about the surveillance of VIEJO and the Trailer's driver to the Baltimore State Police. Based on that information, officers with the Baltimore State Police performed a vehicle stop on the Trailer, and learned that it was driven by  ADEL SANTANA, a/k/a "Adel Santana-Zamora," the same driver who was stopped with 87 pounds of Marijuana in August 2009.  During a search of the Trailer, Baltimore State Police

---

[13]    These telephone conversations include the following: On or about May 18, 2010, at approximately 1:54 p.m., MANUEL RODRIGUEZ, using TARGET CELLPHONE-9 (646-533-1136), called JOSE RODRIGUEZ, a/k/a "Viejo," was using the VIEJO 4794 PHONE referred to in Paragraph 43.  In that call, RODRIGUEZ told VIEJO, "Listen, when you can, leave me the new 'communication' [telephone number] at the restaurant.  We have to change it," and explains that there was an "accident."  RODRIGUEZ explained further, "The man that you saw yesterday, with the 'information' [money], with the one-twelve [$112,000]---you already know.  They're lost."

officers discovered approximately $212,549, which was contained in approximately seven bags.  Two bags, which were the only two bags wrapped in "Kenmore" brand heat-seal bags, contained a total of $112,000.  I believe these two bags contained narcotics proceeds from RODRIGUEZ and VIEJO.

       c.    On or about June 10, 2010, I observed VIEJO transfer a bag in Queens, New York, to JIMMY LOPEZ, a/k/a "Chuck."  The next day, on or about June 11, 2010, I observed VIEJO picking up a bag in Queens, New York, from LOPEZ's home.

       52.    Agents have also conducted surveillance of other TARGET SUBJECTS.  On or about April 4 and 5, 2010, agents conducted visual surveillance of 4053 Carpenter Avenue, Bronx, New York, believed to be the residence of JOSE QUINTERO, a/k/a "Gordo," one of RODRIGUEZ's primary customers.

      53.    During the course of the investigation, it appeared that while RODRIGUEZ would pick up money, he generally would not pick up marijuana or other narcotics himself.[14] Accordingly, surveillance of RODRIGUEZ is unlikely to reveal the location of narcotics, but we may learn where narcotics are located by intercepting telephone conversations between him and

---

[14]    Based on information obtained from interception RODRIGUEZ CELLPHONE-1, RODRIGUEZ CELLPHONE-2, and RODRIGUEZ CELLPHONE-3, agents have learned that RODRIGUEZ travels to Florida to conduct narcotics-related activities.  Historical cell site records confirm that he was using RODRIGUEZ CELLPHONE-1 in Florida during the calls described in Paragraph 34, and he was using RODRIGUEZ CELLPHONE-2, and RODRIGUEZ CELLPHONE-3 in Miami as summarized in Paragraph 38(b).  In addition, RODRIGUEZ possesses a Florida state driver's license.

his co-conspirators, in particular VIEJO, whom we believe is his primary "worker" in the New York City area. Additionally, while photographs from surveillance may help cooperating witnesses identify members of the organization, the surveillance does not otherwise further the investigation, if it is not accompanied by knowledge of the discussions of the individuals being surveilled.

54. Physical surveillance alone has thus not allowed us to learn the full and specific nature of the activities of RODRIGUEZ and others with whom he may be working to traffic in narcotics. Generally speaking, physical surveillance in and of itself is useful mainly in generating information concerning the identity of an individual, where he or she resides, locations he or she frequents, and the identities of the persons with whom he or she meets. It provides limited direct evidence of the significance of the meetings, however. Thus, without wire surveillance to assist agents in understanding the purpose of various meetings and facilitating discrete surveillance, physical surveillance is expected to be of limited utility.

55. It is expected that the information that can be obtained from the interception of wire communications over TARGET CELLPHONE-12 will help law enforcement agents locate the identified TARGET SUBJECTS and continue to identify additional TARGET SUBJECTS, particularly those who are affiliated with RODRIGUEZ and thereby enhance the prospects for fruitful physical surveillance. While a number of RODRIGUEZ's customers and other

associates have been identified through the wiretaps of
RODRIGUEZ's phones thus far, there remain a substantial number of
unidentified coconspirators in activities related to the
laundering of narcotics proceeds, whom ICE believes can be
identified through wiretap surveillance of TARGET CELLPHONE-12
(and corresponding visual surveillance).  In addition, with the
knowledge provided beforehand by wire surveillance that a meeting
is to take place at a given location, or that proceeds or
narcotics will travel over a certain route, it may be possible to
establish physical surveillance at that location or on that route
in advance, thus minimizing the risks of discovery inherent in
following subjects or remaining at target locations for extended
periods of time.

      56.  While, as noted, physical surveillance has been
conducted of bulk currency transfers of RODRIGUEZ and some of the
other TARGET SUBJECTS, I believe that interception over TARGET
CELLPHONE-12 will help us identify how RODRIGUEZ is laundering
the profits from his narcotics business.  Intercepting
communications to and from TARGET CELLPHONE-12 will provide
direct evidence of communications between the TARGET SUBJECTS and
other conspirators and assist in identifying TARGET SUBJECTS,
including locations from which they conduct their activities and
store cash and narcotics; means and methods being used to launder
narcotics funds; and additional money laundering co-conspirators
of the TARGET SUBJECTS -- information that surveillance to date
has not fully revealed.

## TELEPHONE RECORDS

57.   Telephone toll records, although they have been used and are continuing to be used in this investigation, provide only limited information; these methods will not enable law enforcement to identify with certainty the persons involved in committing the TARGET OFFENSES.   We believe that the subscriber names and addresses for many of the phone numbers identified thus far in this investigation, including TARGET CELLPHONE-12 and phone numbers that were the subject of relevant prior wire applications, are fictitious.   Consequently, to date, law enforcement has not been able to fully identify many of the members of the organization, who are in the process of arranging and participating in these drug-trafficking transactions through phone communications.   Moreover, toll records, unlike the interceptions requested herein, do not provide real-time evidence of the content of communications, which are an essential tool not only in providing opportunities to identify the organization's members and interdict its activities, but also to be used as evidence of the commission of those activities.   It is only through the combination of wire surveillance, visual surveillance, and other investigatory tools that the agents expect to identify fully the nature and scope of the organization, including the identities of the individuals who are connected to the conspiracy.

<u>PRIOR WIRE SURVEILLANCE</u>

58.   Prior wire surveillance on telephones that were used by RODRIGUEZ, VIEJO, WILLIAM DELGADO, a/k/a "Mejor," RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," JOSE RAMON PEREZ, KENNETH PENA, and OSMEL VAZQUEZ, a/k/a "Omel," provide only historical information.   Wire surveillance of TARGET CELLPHONE-12 will help us determine from whom the TARGET SUBJECTS are continuing to obtain narcotics, will help identify additional targets, and will help us determine when new shipments of narcotics are expected.

a.   The above-described prior wire surveillance thus far has revealed a significant marijuana distribution network in New York City and a transportation cell from Florida to New York that is supplying at least some members of the marijuana distribution network.   The prior surveillance revealed sufficient information to lead to several seizures of money and/or narcotics, including a seizure of cash from RODRIGUEZ. That prior surveillance, however, has not revealed the identities of the drivers who transport the marijuana from Florida for RODRIGUEZ, or the full extent of the activities of the transportation cell.

b.   In addition, while prior and ongoing surveillance, primarily through TARGET CELLPHONE-4 and TARGET CELLPHONE-8 (the prior "customer" phones that RODRIGUEZ used before obtaining TARGET CELLPHONE-12), has revealed the identities of certain, but not all, of RODRIGUEZ's customers in

80

the New York City area, that surveillance has not revealed the method and manner in which the transactions with those customers are conducted, or the locations of stash houses and other locations important to the organization locally.  Because RODRIGUEZ changes his cellphones frequently, appears to be using approximately four cellphones at any given time, and restricts the use of each of those cellphones to particular purposes and/or contacts, I believe there are likely additional co-conspirators with whom he communicates via telephone who have not been intercepted thus far by wiretap.

        c.   Additionally, wire surveillance of TARGET CELLPHONE-12 will help us determine alternative methods that RODRIGUEZ is utilizing to maintain his supply.  Based on intercepts of TARGET CELLPHONE-8, we learned that RODRIGUEZ intends to supplement his current manner of obtaining marijuana from Florida.  Namely, RODRIGUEZ has discussed starting his own marijuana growing operation locally, and appears to be attempting to rent a warehouse that he could use as a "grow house" for that marijuana.  RODRIGUEZ has, additionally, traveled to California to attempt to develop a source or sources of marijuana in that state - at least one of whom is BURKE - which would then transport the marijuana to him cross-country, much like the Florida transportation network was transporting marijuana and marijuana proceeds during the course of this investigation.  I believe that the contacts RODRIGUEZ is establishing to operate the grow house or grow houses and to obtain marijuana from

California will likely include new TARGET SUBJECTS who have not yet been intercepted over the previous TARGET CELLPHONES.



    e.   Accordingly, through continued surveillance of TARGET CELLPHONE-12, we expect to continue to learn, among other things, the identities and/or locations of RODRIGUEZ's customers in the New York City area; the quantities of marijuana (and the prices at which they are sold) that RODRIGUEZ is selling these customers; and the new means, methods, and co-conspirators who are involved in RODRIGUEZ's more recent plans to operate grow houses and import marijuana from California.

<u>USE OF UNDERCOVER OFFICERS</u>

    59.  At present, there is no expectation that an undercover officer will be able to be introduced into the organization or to determine the full scope of the TARGET SUBJECTS' operations, meet and identify all of the other TARGET SUBJECTS and their co-conspirators, or identify the TARGET SUBJECTS' narcotics suppliers, money launderers and their confederates. Based on my experience as a narcotics investigator, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or

membership when dealing with an "outsider" such as an undercover

officer.  In my experience, narcotics traffickers are usually

highly reticent about discussing narcotics with unknown persons.

Additionally, it is not likely that an undercover officer could

infiltrate the money laundering scheme, as that scheme appears to

be involve complicated transactions that the TARGET SUBJECTS are

unlikely to share with an outsider.  Even if an undercover

officer can subsequently be introduced to RODRIGUEZ no undercover

officer is likely to be aware of the full scope of the activity

of the TARGET SUBJECTS, the identities of all of the TARGET

SUBJECTS, nor all the detailed methods by which the TARGET

SUBJECTS operate their narcotics and money laundering

organization.  Specifically, the undercover officer would not be

able to dictate the timing of the shipments of money or

narcotics, or have a say in how the money or narcotics are moved,

laundered, or invested.  Accordingly, the use of undercover

officers at this time is not available as an alternative

technique to wire surveillance of TARGET CELLPHONE-12.

### USE OF CONFIDENTIAL INFORMANTS

60.  The investigation into the TARGET SUBJECTS has not

involved the use of confidential sources.  I have learned that a

defendant in the Southern District of New York has provided

information about MANUEL GEOVANNY RODRIGUEZ, a/k/a "Shorty,"

a/k/a "Manny."  In sum and substance, this defendant has informed

other law enforcement agents that RODRIGUEZ is a large-scale

marijuana trafficker and controls several "spots" in New York

City where marijuana is sold.  However, this defendant is
incarcerated and is, for that reason and others (some of which
are related to his incarceration), unlikely to be able to obtain
current information about RODRIGUEZ.

61.  There is currently no expectation, in any event,
that any confidential source would be able to determine the full
scope of the TARGET SUBJECTS' operations, meet and identify all
of the other TARGET SUBJECTS and their co-conspirators, or
identify the TARGET SUBJECTS' narcotics suppliers and their
confederates.  Accordingly, wire surveillance is necessary to
learn more about the TARGET SUBJECTS and how they operate.

### FEDERAL GRAND JURY

62.  Use of a federal grand jury does not appear to be
a promising method of investigation.  While certain documents,
such as bank records, could be---and have been---obtained through
grand jury subpoena, the grand jury process is unlikely to be
useful in developing evidence concerning the TARGET SUBJECTS and
the internal operations of the narcotics-trafficking enterprise.
Witnesses who could provide additional relevant evidence to a
grand jury have not been identified or would themselves be
participants in the narcotics trafficking activities under
investigation.  Such individuals would face prosecution
themselves; it is unlikely therefore that any of them would
testify voluntarily.  Nor would it be desirable at this time to
seek immunity for such individuals and to compel their testimony.
Immunizing them could thwart the public policy that they be held

84

accountable for their crimes.  The issuance of grand jury subpoenas likely would not lead to the discovery of critical information and undoubtedly would alert the TARGET SUBJECTS to the pendency of this investigation.  For many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation.  Again, witnesses who could provide additional relevant evidence have not been identified or would themselves be participants in the narcotics trafficking activities under investigation.

### SEARCH WARRANTS AND SEIZURES

63.  We have executed one search warrant, which revealed the presence of narcotics and narcotics proceeds at a "stash house" located in New York, New York.  On or about October 22, 2009, we searched a stash house located at 175 Pinehurst Avenue, New York, New York that ARIEL PENA, a/k/a "Bin, Vin," is believed to control (the "Stash Location").[15]  The search of Stash Location revealed approximately $76,672 in marijuana proceeds, some of which was grouped in rubber bands on a table, and approximately 22 pounds of marijuana inside a closet.  No one was present at the Stash Location at the time of this search and no one was arrested in connection with the seizure of the marijuana and marijuana proceeds.

---

[15]   Other co-conspirators, including WILLIAM DELGADO, a/k/a "Mejor," and RICHARD JIMENEZ-PEREZ, a/k/a "Milton Delgado," a/k/a "Javier Ramirez-Santiago," have been seen entering the Stash Location and/or receiving or dropping off items outside of the Stash Location.

85

64. Applications for search warrants for other locations are generally not appropriate at this stage of the investigation, as many of the locations where the TARGET SUBJECTS conduct their narcotics-trafficking have not been fully identified, and, therefore, there is insufficient information available at this time to support the application for a search warrant. Additionally, a search of certain locations is certain to alert the TARGET SUBJECTS to this investigation and may cause them to flee or to destroy evidence.

65. Additionally, as set forth in Paragraphs 21 through 27, agents seized approximately $25,000 from RODRIGUEZ on or about December 3, 2009. I believe that further seizures of funds from RODRIGUEZ, if we were able to establish probable cause to believe that he possessed marijuana proceeds, may imperil the investigation, as RODRIGUEZ and other TARGET SUBJECTS may modify their activities in response to the seizures. Accordingly, I believe that further seizures are not an appropriate investigative tool at this stage of the investigation.

66. On or about July 21, 2010, based on intercepts from TARGET CELLPHONE-10, which was used by VIEJO, agents provided information to the Rocky Mount North Carolina Police Department on a tractor trailer truck driven by ARTURO MENA, a/k/a "La Vieja," which was pulled over on I-95 North. A consent search of the sleeper cabin revealed approximately 67.63 pounds of marijuana in at least approximately two large duffel bags. MENA was arrested and released the same day on an unsecured

$25,000 dollar bond.  I believe, based on interceptions of TARGET CELLPHONE-10, and between calls between VIEJO and MENA, that at least 41 lbs seized were destined for Manuel RODRIGUEZ.  The intercepted telephone conversations relating to this seizure include the following:

a.   On or about July 20, 2010, at approximately 8:29 p.m., VIEJO received a call from MENA, who was using a telephone assigned the number 786-413-2425 (the "MENA CELLPHONE").  During that call, MENA told VIEJO, in code, that he would be arriving in New York with 41 pounds of marijuana.  MENA said, "So, tomorrow we are gong to celebrate my birthday, right?" VIEJO responded, "Tomorrow?  No problem; let's go to the party." MENA replied, "Tomorrow, I'll be forty-one years old.  When I get there at night, once I finish working, I'll call you so you can pick me up and we'll go to eat somewhere around..."  VIEJO told MENA, later in the conversation, "All right.  We're going to be ready for you, buddy," meaning that VIEJO and his co-conspirators would be ready to accept the marijuana.

b.   On or about July 21, 2010, at 5:51 p.m., VIEJO placed a call to MENA, who was again using the MENA CELLPHONE.  During that call, MENA told VIEJO that he had been arrested and the marijuana had been seized, and that he was willing to send a copy of the documents relating to his arrest and the seizure to VIEJO and his brother:

MENA:     I had an accident today.
VIEJO:    You're not coming over here?

MENA:       No, I didn't call you, because of the
            accident I had in the morning.  I'm out here
            now.  They locked me up around 3:00 in the
            afternoon.  These people were saying that
            they don't put you away for 'that'
            [marijuana] over here.  I have to be here
            tomorrow at 9:00 a.m. for court.  If you want
            me to fax you the paper so you don't have
            doubt?  I didn't think you were going to call
            me, because I called my wife's nephew so he
            could call you.
VIEJO:      Oh, I haven't got a call.
MENA:       That's why I haven't called you.  What
            happened was I had the accident and
            everything got screwed up.  The weird thing
            is the way the accident happened, I would
            swear that it was like someone told them to
            come and get me.  It was very weird.  At
            first, they went into the back of the
            'house,' [trailer] then to the front, and
            then one of them told me to hold on for a
            second and came to the front of the 'house'
            and 'disarmed' the front [believed to refer
            to finding the marijuana].
VIEJO:      I understand.
MENA:       I'm so upset.  You have no idea.  My woman is
            coming up right now, because tomorrow I have
            to pay $25,000 for bail.
VIEJO:      Good luck then.  I don't know what else to
            tell you, cousin.
MENA:       For me, it normal—part of life that happens.
            The only thing is that I wish it didn't
            happen with my brother, because he has a
            million problems right now.  The only good
            thing is that this people are saying that
            they are not putting people away because of
            'that' [marijuana] anymore.  Tell my/your
            brother.  I can give him the 'papers'
            [believed to refer to the documents related
            to his arrest].  I can fax them, too, even
            though I know you guys trust me, but I like
            to be clear on certain things.
VIEJO:      I know.
MENA:       What can I tell you?  I have to be here until
            tomorrow.  They told me what can happen from
            up top.  But remember 'they' [law
            enforcement] say that because it benefits
            them.  Listen, I'm not going to talk anymore.
            When I call you from a different 'address'
            [phone], that is going to be me.  But I'm
            going to wait another two or three days.

## ARRESTS

67.   Arrests of individuals in this organization are
not appropriate at this stage of the investigation.   For example,
on or about November 11, 2009, JOSE RAMON PEREZ was stopped by
officers in the Miami-Dade, Florida area, in a traffic stop
unrelated to this investigation.   PEREZ did not make any
statements to law enforcement officers after this arrest, but
ceased using the telephone number he had been using.   Other
TARGET SUBJECTS also changed their telephone numbers soon after
the arrest of PEREZ.   Additionally, on February 7, 2010, RICHARDO
PIMENTEL was arrested by officers with the Newark Police
Department, who found him to be in possession of marijuana.   This
arrest was not as a result of information learned as a result of
prior interceptions, but interceptions over RODRIGUEZ CELLPHONE-2
revealed that the marijuana he was intercepted with was likely
supplied by RODRIGUEZ.   According to a news report, a total of
$20,000 of marijuana was found in PIMENTEL'S vehicle after law
enforcement officers saw him try to hide a package of marijuana
in his jacket.   PIMENTEL was released on bail on February 10,
2010.   Not long after he was released, PIMENTEL was again
intercepted over RODRIGUEZ CELLPHONE-2, discussing obtaining
additional marijuana from RODRIGUEZ.[16]   Finally, as noted above,

---

[16]   On or about February 11, 2010, at approximately 8:28 p.m.,
RODRIGUEZ, using RODRIGUEZ CELLPHONE-2, received a telephone call
from PIMENTEL.   In that call, PIMENTEL referred to being "caught
the other day," on "the night of the Super Bowl" by the "guards"
[police].   He told RODRIGUEZ that the newspaper covered his
arrest, and that people broke into his apartment and took his TV
sets.   RODRIGUEZ told PIMENTEL that they still needed to meet,

89

ARTURO MENA, a/k/a "La Vieja," was arrested on or about July 21, 2010, after approximately 68 pounds of marijuana was found in his tractor trailer.

68.   Due to my general experience with narcotics traffickers and money launderers, I believe that were an attempt made to arrest certain TARGET SUBJECTS and obtain their cooperation in the current investigation without success, other TARGET SUBJECTS almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation.   Accordingly, the risks of failure in attempting to obtain these targets' cooperation at this stage of the investigation greatly outweigh any likely benefits, and make that investigative technique unavailable.

### RESPONSES TO ACTS OF VIOLENCE

69.   ICE agents will have an action plan to respond to discussions of violence by RODRIGUEZ or his co-conspirators, if it appears that violence is imminent. Agents intend to respond to and disrupt acts of violence by RODRIGUEZ and his co-conspirators in the United States by, for example, coordinating closely with state and locale law enforcement organizations, including the

---

and that "the environment will be heavy," meaning that RODRIGUEZ would be able to supply large quantities of marijuana. RODRIGUEZ, using RODRIGUEZ CELLPHONE-2, then called PIMENTEL on or about February 12, 2010, at approximately 2:39 p.m., and asked him, "so, how was it?  Did you like it?"  PIMENTEL responded, "yes."  I believe this conversation related to PIMENTEL receiving narcotics from RODRIGUEZ, which he tried and found satisfactory.

Drug Enforcement Administration's REDRUM group, which specializes in violent drug investigations.  Additionally, ICE will coordinate with law enforcement organizations and ICE offices in the Dominican Republic and elsewhere if a substantiated threat to individual(s) overseas is verified.

### MINIMIZATION

70.  All monitoring of wire communications over TARGET CELLPHONE-12 will be minimized in accordance with Chapter 119 of Title 18, United States Code.

71.  The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges.  In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring will cease when it is determined that the monitored conversation is not criminal in nature.  Interception will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that neither the TARGET SUBJECTS or any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature.  If an

interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

72.  It is requested that the Order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications.  Certain subjects of this investigation are expected to communicate with each other in Spanish.  It is therefore necessary to secure the services of translators in order to assist the agents in monitoring the wire surveillance and translating the intercepted communications.  All such translators will be under contract to ICE and will be directly supervised by ICE.  It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception.

### AUTHORIZATION REQUEST

73.  Based on the foregoing, it is my opinion that the continued  interception of wire communications occurring over TARGET CELLPHONE-12, as specified above, is essential to uncover the full scope of the illegal activity described herein.

74.  Inasmuch as the illegal operation described herein is a continuing conspiracy involving numerous persons as yet unidentified and unknown, it is requested that it be ordered, as more fully stated in the accompanying application, that

92

authorization to intercept not terminate when the sought wire communications are first obtained, but continue until interception fully reveals the objectives set forth above, or for a period of thirty (30) days, whichever is earlier. The thirty days is measured from the date of this Court's Order.

75. Pursuant to the provisions of Title 18, United States Code, Section 2518(4), it is requested that it be ordered that Sprint/Nextel, the service provider for TARGET CELLPHONE-12, furnish the technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as that provider accord the persons whose communications are to be intercepted (including all dial digits, incoming and outgoing calls, pen register information, and audio interception capability whether the cellular telephone is in roaming mode or otherwise). It is further requested that the service provider maintain service to TARGET CELLPHONE-12 for the period of interception and any extensions thereto. The assistance of this provider is required to accomplish the objectives of the requested interceptions. Reasonable expenses incurred pursuant to this activity will be processed for payment by ICE.

76.   IT IS FURTHER REQUESTED that this affidavit, as it reveals an ongoing investigation, be sealed until further Order of the Court in order to avoid premature disclosure of the investigation, guard against fugitives, and better ensure the safety of agents and others.

JASON SAMUELS
SPECIAL AGENT
IMMIGRATION AND CUSTOMS ENFORCEMENT
DEPARTMENT OF HOMELAND SECURITY

Sworn to before me this
___ day of September, 2010

HONORABLE RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

94