UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,


      -against-                            10-Cr-905 (LTS)

MANUEL GEOVANNY
RODRIGUEZ-PEREZ, et al.,

             Defendant.


-------------------------------------------------------------------X




MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS ON
BEHALF OF MANUEL RODRIGUEZ




Levitt & Kaizer
40 Fulton Street, 23rd floor
New York, New York 10038
(212) 480-4000

# Table of Contents

Table of Authorities ........................................................................................... iii

Preliminary Statement ........................................................................................ 1

Point One

ALL EVIDENCE OBTAINED, DIRECTLY OR DERIVATIVELY, AS A RESULT
OF THE SURVEILLANCE AUTHORIZED ON TP-1 SHOULD BE SUPPRESSED
BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT "NORMAL
INVESTIGATIVE PROCEDURES HA[D] BEEN TRIED AND HA[D] FAILED OR
REASONSBLY APPEAR[ED] UNLIKELY TO SUCCEED IF TRIED" ................... 3

Factual Background .......................................................................................... 4

    A. The Government's First Application ................................................ 4

        1. Alternative Investigative Procedures ................................... 6

        2. Orders Granting Interception of TP-1 ................................ 11

    B. Subsequent Applications ............................................................. 13

Argument ........................................................................................................ 13

    A. The Applicable Law................................................................... 14

    B. The Samuels Affidavit Did Not Establish That Other Investigative Procedures
    Had Been Tried And Failed Or Why They Reasonably Appeared To Be Unlikely To
    Succeed If Tried ........................................................................... 16

        1. Use of Confidential Informants ......................................... 16

        2. Use of Undercover Officers .............................................. 21

        3. Physical Surveillance........................................................ 22

        4. Telephone Records............................................................ 25

        5. Search Warrants................................................................ 26

    C. The Samuels Affidavit Contains Contradictory Factual Allegations................ 26

D.  All Evidence Derived From the Wiretap Surveillance of TP-1 And Subsequent Cell Phones Must Be Suppressed As Fruit Of The Poisonous Tree ...............................29

Point Two

COUNT TWO SHOULD BE DISMISSED AS INSUFFICIENTLY PLEADED OR MULTIPLICITOUS  ...................................................................31

    A.  The Indictment: Counts One and Two ...........................................32

        1.  Count One ...................................................................32

        2.  Count Two ...................................................................33

    B.  Count Two Should Be Dismissed As Insufficiently Pleaded..........................34

    C.  Count Two Should Be Dismissed As Multiplicitous .......................................37

Point Three

THE COURT SHOULD ISSUE A PRETRIAL ORDER REQUIRING THE GOVERNMENT TO IDENTIFY, SUFFICIENTLY IN ADVANCE OF TRIAL, (1) TAPES AND RELATED TRANSCRIPTS; (2) 404(b) EVIDENCE; AND (3) EXPERT TESTIMONY IT INTENDS TO OFFER AT TRIAL, AS WELL AS GIGLIO AND JENCKS ACT MATERIAL  .............................................................40

Point Four

MR. RODRIGUEZ JOINS IN THE ARGUMENTS OF HIS CODEFENDANTS TO THE EXTENT NOT INCONSISTENT WITH THE POSITIONS ADVANCED HEREIN  ...................................................................42

Conclusion ...................................................................43

**Table of Authorities**

**Cases**

*Alderman v. United States*, 394 U.S. 165 (1969) ............................29, 30, 31

*Blockburger v. United States*, 284 U.S. 299 (1932) .......................................38

*Braverman v. United States,* 317 U.S. 49 (1942) .........................................38

*Franks v. Delaware*, 438 U.S. 154 (1978).................................................4, 28

*In re Adelphia*, 338 Bankr. 546 (S.D.N.Y. 2005).........................................41

*In re United States (Frank Coppa, Sr.)*, 267 F.3d 132 (2d Cir. 2001) .........42

*Russell v. United States*, 369 U.S. 749 (1962)..................................35, 36, 37

*United States v. Abrams*, 539 F.Supp. 378 (S.D.N.Y. 1982)..................35, 36

*United States v Anderson*, 416 F.Supp.2d 110 (D.D.C. 2006) .....................41

*United States v. Bin Laden*, 91 F.Supp.2d 600 (S.D.N.Y. 2000) .................36

*United States v Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) )..........................41

*United States v. Broce,* 488 U.S. 563 (1989)................................................38

*United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997)...............16

*United States v. Chacko,* 169 F.3d 140 (2d Cir.1999)............................37, 39

*United States v. Dixon,* 509 U.S. 688 (1993 .................................................37

*United States v. Giordano*, 416 U.S. 505 (1974)....................................14, 29

*United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005).............16, 28

*United States v. Holmes,* 44 F.3d 1150 (2d Cir.1995)...................................37

*United States v Holmes*, 505 F.3d 1288 (D.C. Cir. 2007) ............................30

*United States v Hsia*, 24 F.Supp.2d 14 (D.D.C. 1998) *rev'd in part on other grounds*, 176 F.3d 517 (D.C. Cir.. 1999)...................................................41

*United States v. Humphrey*, 2011 WL 691767

(W.D.N.Y. Feb. 18, 2011) ...................................................... 28

*United States v. Huss*, 482 F.2d 38 (1973) .............................. 29, 31

*United States v. Jones*, 455 F.3d 134 (2d Cir. 2006) ................... 39

*United States v. Josephberg*, 459 F.3d 350 (2d Cir. 2006) ........... 39

*United States v. Kahn*, 415 U.S. 143 (1974) ............................... 14

*United States v. Korfant*, 771 F.2d 660 (2d Cir.1985) ................. 38

*United States v. Lilla*, 699 F.2d 99 (2d Cir 1983) .............. 15, 24, 25

*United States v Locascio*, 2006 WL 2796320 (D.S.C. Cir. 2006) ......... 41

*United States v. Macchia,* 35 F.3d 662 (2d Cir.1994) ................. 38

*United States v. Panzavecchia*, 421 F.2d 440 (5th Cir. 1970), *cert. denied,*
404 U.S. 966 (1971) ............................................... 35, 36

*United States v Poindexter*, 727 F.Supp. 1470 (D.D.C. 1989) ........ 41

*United States v. Ramirez-Encaracion, 291 F.3d 1219 (10th Cir. 2002)* ...... 16

*United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) ............... 16, 29

*United States v. Sapere*, 531 F.2d 63 (2d Cir. 1976) ............. 30, 31

*United States v. Sattar*, 314 F.Supp.2d 279 (SDNY 2004) ............ 37, 38

*United States v. Tomasetta*, 429 F.2d 978 (1st Cir. 1970) ....... 35, 36, 37

*United States v Upton*, 856 F.Supp. 727 (E.D.N.Y. 1994) ........... 41

*United States v. Vilar*, 530 F.Supp.2d 616 (S.D.N.Y. 2008) ........ 30

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ............... 34, 35

*United States v. Zvi*, 168 F.3d 49 (2d Cir. 1999) ................... 38

*Wong Sun v. United States*, 371 U.S. 471 (1963) .................... 30

**Statutes**

18 U.S.C. § 2515 ..................................................... 29

18 U.S.C. § 2518 ..................................................... 12

18 U.S.C. § 2518(1)(c) ........................................................... 3, 14

18 U.S.C. § 2518(3)(c) ........................................................... 3, 14

21 U.S.C. §§ 841 (a) (1) and (b) (1) (A) .......................... 32, 33, 34

21 U.S.C. § 846 ...................................................................... 1, 2, 32

Fed.R.Crim.P. 7(c)(1) ............................................................ 34, 37

Fed.R.Evid. 404(b) ................................................................. 40, 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,

           v.                                   10- Cr- 905 (LTS)

MANUEL GEOVANNY RODRIGUEZ-
PEREZ, et al.,

           Defendants.
------------------------------------------------------X

## PRELIMINARY STATEMENT

    This memorandum of law is submitted on behalf of Manuel Geovanny Rodriguez-Perez ("Rodriguez") in support of his motion to suppress evidence derived through electronic surveillance of his cell phones (Point One); to dismiss Count Two of the indictment as insufficiently pleaded or as multiplicitous or for other relief (Point Two); for a pretrial order requiring the government to provide certain disclosures at least six weeks before jury selection (Point Three); and for leave to join in the arguments of Mr. Rodriguez's co-defendants to the extent they are not inconsistent with the arguments raised herein (Point Four).

    By way of introduction, Mr. Rodriguez is charged in Counts One and Two of a ten-count Indictment. Count One, which bears the subtitle "Organization Marijuana Conspiracy," charges a conspiracy to distribute more than 10,000 pounds of marijuana from 1992 to October 2010 in violation of 21 U.S.C. § 846. Count Two, which is subtitled "Rodriguez Cell Marijuana Conspiracy," also

charges a conspiracy to distribute more than 10,000 pounds of marijuana from 1992 to October 2010 in violation of 21 U.S.C. § 846. The only apparent distinction between the two counts is that Count Two appears to be a subset of Count One, as all persons charged in Count Two are also charged in Count One, but Count One charges certain persons who are not charged in Count Two.

Essentially, the indictment alleges a far-flung conspiracy to distribute marijuana through numerous "cells." Between January 7, 2010, and September 24, 2010, the government made 15 applications to obtain orders permitting electronic surveillance/interception of 10 cell phones used by Mr. Rodriguez. Each application was granted, as a result of which hundreds of recordings were made of incoming and outgoing calls to and from the target phones. Additionally, with each application granted, an order was issued directing the cell phone provider (principally Sprint/Nextel) to provide to Immigration and Customs Enforcement ("ICE"), for a period of 30 days, any cell site information regarding intercepted communications by making such information accessible to ICE's "Smart System."

# POINT ONE

## ALL EVIDENCE OBTAINED, DIRECTLY OR DERIVATIVELY, AS A RESULT OF THE SURVEILLANCE AUTHORIZED ON TP-1 SHOULD BE SUPPRESSED BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT "NORMAL INVESTIGATIVE PROCEDURES HA[D] BEEN TRIED AND HA[D] FAILED OR REASONABLY APPEAR[ED] UNLIKELY TO SUCCEED IF TRIED"

In the course of its investigation, the government obtained orders permitting electronic surveillance of 10 cell phones used by Mr. Rodriguez. As a result, the government intercepted and taped hundreds of hours of conversations over the target cell phones and was authorized to track the location of the cell phones (and thus Mr. Rodriguez) via cell site or other information from the phone providers for nearly a year.

This evidence should be suppressed because the government failed to provide, as required under 18 U.S.C. §2518(1)(c), a "full and complete statement" of facts sufficient for the court to determine, as required by 18 U.S.C. § 2518(3)(c), that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried…" Rather than make the requisite showing of necessity, in his affidavit in support of the electronic surveillance application, ICE Agent Jason Samuels provides little more than platitudes, generalities, conclusory statements and misinformation.

In making this argument, we are well aware that most necessity arguments fail. Regrettably, the government's substantial success in defending such motions

has bred a certain complacency and a belief that it will not be held to the exacting standards of the necessity requirement before it will be permitted to utilize what – at least at one time – was recognized to be a substantial intrusion on personal privacy. We are confident that this Court will not simply accept this motion as "just another necessity motion," but rather will carefully review it and determine that the government's proffer of necessity was woefully deficient.

For the reasons that follow, this Court should suppress both the direct evidence obtained from the execution of the first electronic surveillance order against Mr. Rodriguez – "TP-1" – as well as all evidence derived therefrom. We also ask the Court to conduct a *Franks* hearing (*Franks v. Delaware*, 438 U.S. 154 (1978)) with respect to assertions of fact we allege below to be false or grossly misleading.

## FACTUAL BACKGROUND

### A. <u>The Government's First Application</u>

The government's first application for an electronic surveillance order targeting Mr. Rodriguez's cell phone – number 646-964-3580 ("TP-1") – was filed on January 7, 2010 by Assistant United States Attorney Amie Ely ("Ely App.," Exhibit B) and was based on the affidavit of the same date provided by ICE Special Agent Jason Samuels ("Samuels Aff.," Exhibit C).

The point at which the investigation began to focus on Mr. Rodriguez is not entirely clear from Samuels' affidavit. In one section, Samuels states that agents of ICE, the DEA and the FBI had been investigating Mr. Rodriguez and others since "in or about February 2009," Samuels Aff. at ¶ 18, yet elsewhere he states that the surveillance of Mr. Rodriguez began "in or about early December 2009." *Id.* at ¶ 35.

In any event, on December 3, 2009, based on conversations intercepted in November and December 2009 from a cell phone used by co-defendant Kenneth Pena, agents set up physical surveillance through which they observed Mr. Rodriguez at a pre-planned meeting with Pena. At this meeting, Pena was supposedly going to give Mr. Rodriguez $25,000 he owed him from past sales of marijuana. Agents did not see any exchange of money and lost track of Pena after he left the scene in a car, but later stopped Mr. Rodriguez in his (Mr. Rodriguez's) car and seized $25,000. They chose not to arrest Mr. Rodriguez at that time. *Id.* at ¶¶ 22-29.

The toll records of TP-1 indicated that the account for Mr. Rodriguez's phone had been open since September 12, 2009, and that between that date and December 18, 2009, Mr. Rodriguez's phone had on numerous occasions been used to contact cell phones allegedly belonging to Ariel and Kenneth Pena and someone called "Conejo" who was also suspected of marijuana trafficking. *Id.* at ¶¶ 30-33.

## 1. **Alternative Investigative Procedures**

AUSA Ely stated that, based on Samuels' affidavit, normal investigative techniques "have been tried and have failed or reasonably appear unlikely to succeed if tried." Ely App. at ¶4 (e). Samuels contends in his affidavit that alternative investigative procedures had been "tried or appeared unlikely to succeed if tried" or were "likely to be too dangerous to employ" and that there was, thus, a "compelling need in this case for wire surveillance" of TP-1.[1] Samuels Aff. at ¶ 34. Samuels gave principally the following reasons, in the order in which they appear in his affidavit:

- **Physical Surveillance:** Aside from the December 3, 2009, surveillance that resulted in the seizure of $25,000 from Mr. Rodriguez, Samuels alleged that agents had conducted physical surveillance of "certain" target subjects, through which they observed "multiple truck deliveries of marijuana in the vicinity of Diamond Street and Calyer Street in Brooklyn, New York, which resulted in the seizure of over 87 pounds of marijuana." Samuels Aff. at ¶ 35. Samuels and other agents also attempted to conduct physical surveillance of Mr. Rodriguez on three other occasions – December 29, 30 and 31 – at his residence, but Mr. Rodriguez was not seen on those dates.

---

[1] Despite Samuels' assertion that other investigative procedures were likely "too dangerous to employ," he sets forth no support for that conclusion in his affidavit. Moreover, the government and the court that granted the application did not rely on this prong of the statutory necessity requirement. *See* Ely App. at ¶ 4(e); Sealed Order (Exhibit D) at ¶ (d).

Agents "attempted to conduct surveillance of Mr. Rodriguez "four additional times, in the greater New York area." *Id.*[2] Samuels alleged that "while [Mr. Rodriguez] will pick up money, he generally does not pick up marijuana or other narcotics himself" and that, therefore, surveillance of Mr. Rodriguez was unlikely to reveal the location of narcotics or the "full and specific nature" of the activities of Mr. Rodriguez and others with whom he was trafficking. *Id.* at ¶ 36-37. Samuels further stated that "while photographs from surveillance may help cooperating witnesses identify members of the organization, the surveillance does not otherwise further the investigation, if it is not accompanied by knowledge of the discussions of the individuals being surveilled." Samuels Aff. at ¶ 36.

- **Toll Records**: Toll records provided "only limited information" and "will not enable law enforcement to identify with certainty the persons involved in committing the [target offenses]." *Id.* at ¶ 40.

- **Prior Wire Surveillance**: Prior wire surveillance of several co-defendants provided "only historical information" but would not help law enforcement determine additional participants in trafficking or when new narcotics shipments were expected. *Id.* at ¶ 41. Additionally, while Samuels acknowledged that prior wire surveillance had "thus far revealed a

---

[2] It is actually unclear whether this included the three unsuccessful attempts at Rodriguez's residence.

significant marijuana distribution network in New York City and a transportation cell from Florida to New York that is supplying at least some members of the marijuana distribution network," according to Samuels, it had "not revealed the identities of the drivers and full extent of the activities of the transportation cell." *Id.* Prior surveillance also had not, according to Samuels, revealed the drug sources from whom the transportation cell obtain[ed] marijuana," with whom he believed Mr. Rodriguez was directly communicating. *Id.*

- **Undercover Officer**: Agent Samuels maintained that an undercover officer could not be introduced into the trafficking organization. He stated:

> Based on my experience as a narcotics investigator, I believe that drug traffickers are unlikely to discuss the full extent of their organization's activities or membership when dealing with an "outsider" such as an undercover officer. In my experience, narcotics traffickers are usually highly reticent about discussing narcotics with unknown persons."

Samuels Aff. at ¶ 42.

Further, Samuels stated, even if an undercover officer were introduced to Mr. Rodriguez, the officer would be unlikely to become aware of the "full scope" of Mr. Rodriguez's activities, "dictate the timing of the shipments of money or narcotics, or have a say in how the money or narcotics are moved." *Id.*

- **Confidential Informant:** Samuels had learned that a defendant in custody in the Southern District of New York had provided information about Mr. Rodriguez. Samuels Aff. at ¶ 43. Without revealing what this defendant told law enforcement, Samuels maintained that, "this defendant is incarcerated and is for that reason and others (some of which are related to his incarceration), unlikely to be able to obtain current information about [Rodriguez]." *Id.* Samuels further stated that, in any event, there was no expectation "that any confidential source would be able to determine the full scope of the [target subjects'] operations, meet and identify all of the other [target subjects] and their co-conspirators, or identify the [target subjects'] narcotics suppliers and their confederates." *Id.*

- **Grand Jury**: Samuels opined that use of a federal grand jury would not be "a promising method of investigation for several reasons: 1) any records subpoenaed by the grand jury would be unlikely to be useful in developing evidence concerning the target subjects and the internal operations of the trafficking enterprise; 2) any witnesses who testified before the grand jury were likely to be participants in the trafficking enterprise and, therefore, to testify only under a grant of immunity, and it would not be desirable "at this time" to grant immunity to such individuals because "[i]mmunizing them could thwart the public policy that they be held accountable for their

crimes;" 3) the issuance of grand jury subpoenas "would not lead to the discovery of critical information and would undoubtedly alert the [t]arget [s]ubjects to the pendency of this investigation;" and 4) "for many of the same reasons, the use of witness interviews does not appear to be a promising method of investigation." Samuels Aff. at ¶ 45.

- **Search Warrants**: One search warrant had been executed on October 22, 2009, at a Manhattan stash house; $76,672 in alleged marijuana proceeds and 22 pounds of marijuana was seized. Samuels Aff. at ¶ 46. However, according to Samuels, additional applications for search warrants were "not appropriate at this stage of the investigation" because there was insufficient information available to support any application for a search warrant as other stash locations had not been "fully identified." *Id.* at ¶47. Further, although money had been seized from Mr. Rodriguez on December 3, 2009, Samuels contended that "further seizures of funds from [Rodriguez] … [might] imperil the investigation, as [Rodriguez] and other [target subjects] [might] modify their activities in response to the seizures." *Id.* at ¶ 48.

- **Arrests**: According to Samuels, arrests of individuals in the organization from whom law enforcement might then obtain cooperation were "not appropriate at this stage of the investigation." Samuels Aff. at ¶ 49. Samuels cited the November 11, 2009, traffic stop and arrest (unrelated to

this investigation) of co-defendant Jose Ramon Perez in Florida. Perez made no statements to police after his arrest and Perez and other subjects of the investigation changed their telephone numbers shortly after his arrest. *Id.* Because of that and his "general experience with narcotics traffickers and money launderers," Samuels believed that, "were an attempt made to arrest certain [target subjects] and obtain their cooperation in the current investigation without success, other [target subjects] almost certainly would be alerted to the existence of the investigation and would take defensive measures that would seriously jeopardize the investigation." *Id.*

## 2. Orders Granting Interception of TP-1

On January 7, 2010, the United States District Court for the Southern District of New York (Daniels, J) granted the government's application and issued two orders. In its "Sealed Order" (Exhibit D), the court found probable cause to believe Mr. Rodriguez and others were involved in drug trafficking and related offenses, that the interception of TP-1 would reveal the nature and extent of the illegal activities (including identities of participants, etc.), and that it had been "adequately established that normal investigative techniques have been tried and have failed or reasonably appear unlikely to succeed if tried." The court therefore authorized ICE "to intercept and to record wire communications" of TP-1, and ordered Sprint/Nextel to provide toll records as well as cell site data and other

information and technical assistance "needed to ascertain the physical location" of TP-1 "for a period of thirty (30) days."

In its "Order to Sprint/Nextel" (Exhibit E), the court, having found that the government's application "conform[ed] in all respects to the requirements of Title 18, United States Code, Sections 2516 and 2518," ordered Sprint/Nextel to provide the "information, facilities and technical assistance necessary to accomplish the interception." *Id.* at 2. Further, pursuant to Fed. R. Crim. P. 41(b), the court ordered Sprint/Nextel to:

- provide information, facilities and technical assistance to ICE agents in "ascertain[ing] the physical location of [TP-1], including but not limited to data indicating the specific latitude and longitude of (or other precise information concerning) [the first cell phone] ... for a period of thirty days" *(id.* at 3);

- "disclose Requested Location Information concerning [TP-1], and initiate a signal to determine the location of [TP-1] on the service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed Order" *(id.* at 3); and

- "provide originating and terminating cell site information for the intercepted wire communications by permitting ICE's Smart System

to access such information." *Id.* at 4.

**B. <u>Subsequent Applications</u>**

There were, upon information and belief, 14 subsequent applications for wiretap surveillance of 9 other cell phones used by Mr. Rodriguez.[3] Most were supported by affidavits prepared by Agent Samuels.[4] All contained the same necessity justifications as the instant Samuels affidavit. So as not to unduly burden the Court by annexing all of the applications, affidavits and orders, we have submitted as an example one such application, prepared by AUSA Daniel P. Chung, dated September 3, 2010, and the relevant portions of its supporting affidavit of the same date, prepared by Agent Samuels. *See* Exhibits H and I, respectively.

**ARGUMENT**

In attempting to establish that the wiretap of Mr. Rodriguez's cell phone was necessary because normal investigative techniques could not be effectively utilized, the government relied on the "tried and failed" and "unlikely to succeed" prongs of the statutory "necessity requirement."[5] A review of Agent Samuels' affidavit, however, demonstrates that it fails to satisfy either prong. Instead,

---

[3] Based on the applications provided to counsel by the government. Some applications were for continued surveillance of the same cell phone. *See* Exhibit A.
[4] Another agent who submitted a supporting affidavit was ICE Special Agent Thomas Acocella.
[5] As stated previously, the government does not rely on the "too dangerous" prong. Ely App. at ¶ 4(e); Sealed Order at ¶ (d).

Samuels merely states that each posited technique *alone* would not provide *complete* information or *fully* reveal the magnitude of the conspiracy. Obviously, this is not the standard for gauging the likely efficacy of traditional investigative techniques. And in support of these deficient statements, Agent Samuels provides an inadequate and misleading series of statements calculated to understate the efficacy of traditional investigatory techniques – both used and unused – and, in the end, shows no more than that electronic surveillance of Mr. Rodriguez's phone calls would be a useful expedient rather than a necessity.

## A. The Applicable Law

Pursuant to 18 U.S.C. § 2518(1)(c), each application for an electronic surveillance order must include, *inter alia*, a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Each electronic surveillance order must include a similar determination by the authorizing judicial officer. 18 U.S.C. § 2518(3)(c).

This requirement is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974). Wiretaps are intended to be used with restraint and not "routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).

Although the required statutory showing "is to 'be tested in a practical and commonsense fashion' … an affidavit offered in support of a wiretap must provide some basis for concluding that less intrusive investigative procedures are not feasible." *United States v. Lilla*, 699 F.2d 99, 103 (2d Cir 1983). The affidavit must demonstrate either that normal investigative techniques have been tried and proven unsuccessful or, if normal investigative techniques have not been tried, set forth specific facts forming the basis for the belief that if normal investigative techniques were tried, they would be unsuccessful. As the *Lilla* court states, mere generalizations are insufficient:

> The requirement of a "full and complete statement" regarding procedures attempted or considered prior to the application for a wiretap serves both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasion of privacy. Like other courts, we reject generalized and conclusory statements that other investigative procedures would prove unsuccessful.

*Lilla*, 699 F.2d at 104 (citations omitted).

Most drug investigations – even large ones – do not involve the use of electronic surveillance; thus, courts should be skeptical when the government uses mostly platitudes and generalities to justify the use of this extraordinarily intrusive device in a particular case. Although far more cases uphold than reject the government's assertion of necessity – often with little meaningful analysis – certain courts have declined to accept inadequate claims of necessity. In such

cases, courts have properly criticized the government for not fully informing the court about its investigatory efforts (*United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007)); or for not adequately demonstrating that traditional investigatory methods were unlikely to be successful (*United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1113-15 (9th Cir. 2005), *amended by* 437 F.3d 854 (9th Cir. 2006)); or for relying on conclusory language and only limited use of traditional techniques (*United States v. Castillo-Garcia*, 117 F.3d 1179, 1194 (10th Cir. 1997), *overruled on other grounds by United States v. Ramirez-Encaracion*, 291 F.3d 1219 (10th Cir. 2002)).

**B.** **The Samuels Affidavit Did Not Establish That Other Investigative Procedures Had Been Tried And Failed Or Why They Reasonably Appeared To Be Unlikely To Succeed If Tried**

The showing of necessity attempted by Agent Samuels suffered from a number of fatal defects. We discuss each of Samuels' flawed justifications for electronic surveillance below. However, two stand out as particularly facile and are addressed first: 1) Samuels' unpersuasive explanations of why a known or other confidential informant could not be utilized in the instant investigation and 2) Samuels' conclusory generalizations explaining why an undercover officer was not a viable investigative alternative.

### 1. Use Of Confidential Informants

Samuels states, with regard to the use of Confidential Informants:

The investigation into the [target subjects] has not involved the use of confidential sources. I have learned that a defendant in the Southern District of New York has provided information about [Manuel Geovanny Rodriguez], a/k/a "Shorty," a/k/a "Manny." However, this defendant is incarcerated and is, for that reason and others (some of which are related to his incarceration), unlikely to be able to obtain current information about [Rodriguez].

Samuels Aff. at ¶ 43.

*This representation, by itself, vitiates any claim of necessity.* Samuels here tells the court that a criminal defendant has been cooperating against Mr. Rodriguez, yet Samuels fails to provide the court with even a hint of what this defendant has said. Has Samuels spoken to this cooperator? If so, what information did he/she proffer? Why was the court not informed of what the defendant said to permit it to assess the value of the information and the need for electronic surveillance? If Samuels did not speak with this cooperating defendant, why not? How can Samuels in good faith assert that traditional investigatory techniques are insufficient if he hasn't availed himself of one such technique that is readily available and which traditionally provides powerful – often singularly sufficient – information to prosecute? Indeed, the overwhelming majority of drug cases are *not* pursued with electronic surveillance, but often rely on confidential informants. Agent Samuels fails to establish that this case is different.

Samuels states, "this [cooperating] defendant is incarcerated and is, for that reason and others (some of which are related to his incarceration), unlikely to be

able to obtain current information about [Rodriguez]." This vague statement simply begs the question of what information the cooperator *did* in fact provide, and what assistance he might be capable of providing going forward. Why is Samuels being coy with the court? What would be his reason for not frankly and fully divulging what the informant said and to whom? What does he mean when he says the informer is "unlikely" to be able to obtain "current information" about Mr. Rodriguez? Why is this issue even in doubt if the informant is providing the government information? The only reasonable conclusion one can draw from Samuels' failure to disclose the nature of the assistance provided by this cooperator is that Samuels was not being forthright with the court. This alone foreclosed a finding of necessity.

Samuels further laments that, "[t]here is currently no expectation, in any event, that any confidential source would be able to determine the *full scope* of the [target subjects'] operations, meet and identify *all* of the other [target subjects] and their co-conspirators, or identify the [target subjects'] narcotics suppliers and their confederates." Samuels Aff. at ¶ 44 (emphasis added). The government did not, however, advance its argument by suggesting that *any one* traditional investigative technique is unlikely to unravel the "full scope" of the conduct under investigation. Samuels' use of phrases such as "full extent" and "full scope" and "all" is meaningless since it is self-evident that no person is ever likely to know the "full

extent" or "full scope" of another person's activities. Yet the fact that no traditional investigative tool is perfect does not mean it would not represent an important component of a traditional investigation. Indeed, confidential informants are often used as part of a traditional investigation without the expectation that they will, standing alone, reveal the full scope of an individual's or enterprise's criminal activities. Necessity is not gauged against the likely efficacy of any single technique.

Relatedly, Samuels contends that the use of arrests would not be a useful investigative tool because, if the government failed to make the arrestee a cooperator, the target subjects would be alerted to the investigation and modify their activities in a way that would jeopardize the investigation. Samuels Aff. at ¶¶ 48, 49. Samuels likewise contends, "applications for search warrants were not appropriate at this stage of the investigation" in part because "further seizures ... may imperil the investigation, as [Rodriguez] and other [target subjects] may modify their activities in response to the seizures." *Id.* at ¶ 48.

Yet the only modification in activities by target subjects that Samuels noted as a result of any law enforcement arrests or seizures was changing cell phones, and even this did not always occur. For example, even after the agents stopped and seized $25,000 from Mr. Rodriguez a few hours after he had arranged, by cell phone, to meet with Pena to collect the money, which was allegedly in payment for

prior marijuana transactions, Mr. Rodriguez did not change his cell phone, let alone modify his activities in any major way.[6] Samuels Aff. at ¶ 30-32. Similarly, Samuels acknowledged that Jose Ramon Perez, an alleged co-conspirator, did no more than change his cell phone number after his arrest in Florida in November 2009. *Id.* at ¶ 49. In any event, targets commonly change cell phones regardless of whether they perceive specific law enforcement activity, and so the possibility that this might occur as a result of an effort to "flip" an arrestee is of no moment.

Further, Samuels provided the court no good reason to conclude that target suspects would not cooperate. The fact that Perez "did not make any statements to law enforcement after his arrest," *id.* at ¶ 49, is irrelevant since he was arrested pursuant to a traffic stop "unrelated to this investigation." *Id.* There was no reason why Perez would speak to law enforcement about his involvement in drug trafficking following a traffic stop, particularly one in which no drugs were seized. This hardly establishes that had he (or any target subject) actually been arrested by ICE on drug-trafficking charges he would not have cooperated.

Samuels simply did not establish that the arrest of target subjects and the seizure of evidence would result in "defensive measures" that would "seriously

---

[6]     Nor after he allegedly became aware of surveillance on January 8, 2010, did Mr. Rodriguez change his cell phone or modify his activities. It was not until approximately January 19, 2010, that Mr. Rodriguez stopped using TP-1 entirely. *See* First and Second Periodic Reports (Exhibits F and G).

jeopardize the investigation."[7] *Id.* at ¶ 49. Indeed, arresting, seizing evidence and "flipping" suspects are common law enforcement techniques that Samuels and/or his colleagues undoubtedly have used on numerous occasions; Samuels simply disowned these techniques here as part of his cynical attempt to get the court to rubber stamp his electronic surveillance application.

### 2. Use Of Undercover Officers

Attempting to explain why the use of undercover officers was not possible, Samuels stated that:

> At present, there is no expectation that an undercover officer will be able to be introduced into the organization or to determine the *full scope* of the target subjects' operations, meet and identify *all* of the other target subjects and their co-conspirators, or identify the target subjects' narcotics suppliers and their confederates. Based on my experience as a narcotics investigator I believe that drug traffickers are unlikely to discuss the *full extent* of their organization's activities or membership when dealing with an 'outsider' such as an undercover officer" and that even if an undercover officer could gain entry, no undercover officer is likely to be aware of the *full scope* of the activity of the [target subjects], the identities of *all* of the [target subjects], nor *all* the detailed methods by which the [target subjects] operate.

Samuels Aff. at ¶ 42 (emphasis added).

The previously stated arguments regarding Samuels' use of phrases such as

---

[7]    This was a continual theme recited by Samuels in all subsequent affidavits despite even more evidence that target subjects, at most, changed their cell phones on suspicion of surveillance, following seizures of drugs and following arrests of alleged co-conspirators, but did not otherwise change their conduct in any way that jeopardized the investigation. *See e.g.* Samuels Aff. of September 3, 2010 (Exhibit H) at ¶¶ 50, 51(b), 51(b) fn 13, 64, 66(a), (b), 67, 68.

"full extent," "full scope" and "all" apply equally here. Samuels stated the obvious; it is *always* the case that an undercover officer may not be able to learn the **full scope** or extent of the criminal activities of an individual or enterprise. Indeed, it is rare that an investigation is complete before arrests are made in any multi-target drug case. Rather, targets are arrested – often on a complaint – subpoenas are issued, a grand jury further investigates, an indictment is returned, various defendants cooperate and the prosecution runs its natural course. Thus, Samuels' lament that any particular traditional technique would not open Pandora's Box did not distinguish this case from any other case or explain why in this case, the choice was made not to attempt the use of an undercover officer, let alone other traditional modes of investigation. Indeed, all persons familiar with drug investigations know of multiple instances where undercover officers were used, yet Samuels nowhere explains why this investigation was different.

### 3. **Physical Surveillance**

Samuels acknowledges that he and his fellow agents had already successfully conducted surveillance of "what are believed to have been multiple truck deliveries of marijuana in the vicinity of Diamond Street and Calyer Street in Brooklyn, New York, which resulted in the seizure of over 87 pounds of

marijuana."[8] Samuels Aff. at ¶ 35. He acknowledges as well that his fellow agents had successfully surveilled Mr. Rodriguez on two occasions, including on December 3, 2009, when they seized $25,000 from him. *Id.* Samuels contends, however, that although Mr. Rodriguez would pick up money, he "generally" did not pick up drugs himself. *Id.* at ¶ 36. Thus, concluded Samuels, surveillance was not likely to reveal the location of drugs, but a phone tap might reveal this information. *Id.*

To the extent that he proffers such statements in support of a necessity requirement, Samuels' logic is, at best, flawed. That Mr. Rodriguez – assuming *arguendo* his coconspirator status – may not himself handle marijuana does not mean that electronic surveillance is the only means to determine who does. Indeed, one would think that the agents could likely locate a marijuana source by surveilling, for example, the truck drivers who made deliveries of marijuana. Samuels does not state whether this was attempted or why it could not be done, particularly considering the agents' successful efforts to surveil "multiple" marijuana deliveries and their seizure of more than 87 pounds of marijuana. Nor does Samuels state whether the truck drivers were arrested or even questioned. Based on Samuels' affidavit, one could conclude that the agents witnessed the

---

[8]     It is unclear what Samuels means when he states that he "believes" that what he or his fellow agents witnessed were "multiple truck deliveries" of marijuana in light of the successful seizure of 87 pounds of marijuana from trucks. Why does Samuels have so much difficulty speaking plainly and frankly to the issuing judge?

delivery of 87 pounds of marijuana and then allowed the participants to walk away. This is unlikely. More likely, Samuels made a strategic decision to withhold from the judicial officer certain information in order to provide greater resonance for his necessity argument.[9]

Likewise, although agents lost Kenneth Pena after their surveillance of his meeting with Mr. Rodriguez on December 3, 2009, it seems unlikely that they did not obtain the license plate number of the vehicle he was driving, and thereby obtain his address and surveil him. After all, since Pena was allegedly paying Mr. Rodriguez for marijuana, it is likely that Pena (unlike Mr. Rodriguez) did handle marijuana and therefore that watching him would have "reveal[ed] the location of narcotics." Samuels Aff. at ¶ 36. Again, Samuels does not state if this was done or, if not, why.

Notably, in *Lilla*, where "ordinary" investigative techniques were arguably less productive than in the present case, the Second Circuit rejected the affiant's conclusory statement that surveillance could not be used to learn the identities of those participating in marijuana trafficking:

> We see no reason why surveillance of [defendant] or the use of

---

[9]    In fact in a subsequent affidavit, Samuels revealed the name of the truck driver. *See* Samuels Affidavit of September 3, 2010 ¶ ??. In describing an April 26, 2010, surveillance of another co-defendant seen meeting with the driver of a tractor trailer near the Bronx Terminal Market, Samuels stated, "I believe, based on his surveillance of that meeting, that the driver of that trailer was Adel Santana. a/k/a/ 'Adel Santana-Zamora,' from whom approximately 87 pounds of marijuana was seized in August 2009." *Id.* at ¶ 51(a). It is therefore apparent that Samuels had more pertinent information about this incident than he provided to the court.

informants could not have yielded this information. The affidavit supporting the application for the wiretap does nothing to allay our fears that the State in this case relied on wiretapping as a substitute for standard investigative procedures, a result that both New York and federal statutes are designed to avoid. The statutory requirements are not so lightly to be regarded.

*Lilla*, 699 F.2d at 105.

Samuels also stated that, "while photographs from surveillance may help cooperating witnesses identify members of the organization, the surveillance does not otherwise further the investigation if it is not accompanied by knowledge of the discussions of the individuals being surveilled." Samuels Aff. at ¶ 36. The statement implies that Samuels has access to "cooperating witnesses" yet, as discussed earlier, elsewhere in his affidavit Samuels stated that no cooperating witness was being used, *id.* at 43 (except to the extent that he stated, in contradictory fashion, that a defendant in the SDNY was providing information regarding Mr. Rodriguez). If in fact cooperating witnesses were being used, Samuels was required to provide that information and explain why this investigative method, considered with others, had failed or was likely to fail, thereby necessitating a wiretap of Mr. Rodriguez's phone.

## 4. Telephone Records

Samuels complains that telephone toll records "do not provide real-time evidence of the content of communications." Samuels Aff. at ¶ 40. Obviously, not every tool provides complete information, and saying that toll records don't

provide content is both self-evident and irrelevant. What they do provide are links between different phones and callers and that, of itself, makes telephone records a useful investigative tool and one that could have been used with other ordinary investigative tools to attain the objectives of this investigation.

### 5. Search Warrants

One reason given by Samuels for not using search warrants as an investigative tool (beyond the use of one to raid a stash house on October 22, 2009, *see ante* at 10), was that "***many*** of the locations where the [target subjects] conduct their narcotics trafficking [had] not been ***fully identified***." Samuels Aff. at ¶ 47 (emphasis added). The implication of Samuels' statement is that at least *some* locations had in fact been located. Samuels also uses the vague phrase "not fully identified" to obscure the facts regarding other locations. In order to bolster his necessity claim, Samuels once again appears to have withheld facts necessary for the court to properly evaluate his claim of necessity.

### C. The Samuels Affidavit Contains Contradictory Factual Allegations

Samuels' affidavit also contains a number of apparent contradictions. For example, Samuels makes different statements regarding the length of the agents' surveillance of Mr. Rodriquez. In one paragraph, we are told that agents have been investigating Mr. Rodriquez and others since "in or about February 2009." Samuels Aff. at ¶ 18. Elsewhere, however, we are told that surveillance of Mr.

Rodriquez began "in or about early December 2009." *Id.* at ¶ 35; *cf.* Par. 22(a) (where Samuels states that on "November 24, 2009," Mr. Rodriguez called Pena). Samuels also contradicts himself in his description of the court-ordered wiretap of the telephone supposedly used by Kenneth Pena and assigned call number 347-321-5805 (the wiretap that seems to have resulted in the first overhears of Mr. Rodriquez). In a single paragraph, we are alternately told, "Interception on the telephone assigned call number 347-321-5805 began on or about November 12, 2009, and *continues* through the date of this affidavit" (i.e. January 7, 2010), and "Interception of the phone assigned call number 347-321-5805 *ceased* on or about December 11, 2009." *Id.* at ¶ 4(f)(vii). Which is it?

These factual contradictions, combined with the strategic withholding of information discussed above, diminish confidence in what Samuels asserts in his affidavit generally. Moreover, they expose factual anomalies that required further clarification by the court before it granted the application. If, for example, agents only began investigating Mr. Rodriguez in December 2009, it is not clear how they knew it was Mr. Rodriguez who called Pena on November 24, 2009. If the investigation of Mr. Rodriguez began in February 2009, there is a glaring deficiency in the affidavit regarding what kind of investigation was taking place in the period of almost a year between February and the instant application.

Agent Samuels' failure to explain whether he had spoken with the SDNY cooperating defendant and what that defendant revealed compels suppression because it demonstrates that he failed to provide the required "full and complete" statement establishing necessity. But even absent this failure on Samuels' part, the material misrepresentations and omissions in the affidavit would require a *Franks* hearing. *See United States v. Humphrey*, 2011 WL 691767 (W.D.N.Y. Feb. 18, 2011) (granting *Franks* hearing on necessity in light of questions as to the accuracy of the representations regarding the impossibility of physical surveillance and fact that supporting affidavit contained "significant portions of boilerplate language relating to necessity"); *Gonzalez, Inc.*, 412 F.3d at 1110 (*Franks* hearing granted to determine whether affidavit supporting wiretap contained false statements that were deliberately or recklessly included, where proponents submitted documents that tended to show that affidavits misrepresented the extent of their use of pole cameras for surveillance in the investigation, misrepresented that further physical surveillance of premises was highly likely to be compromised, inaccurately portrayed the government's confidential informants ("CIs") as having less access to the company's officers and owners than they actually possessed, and misrepresented the ability of the government to place an undercover agent in the company).

**D. All Evidence Derived From The Wiretap Surveillance Of TP-1 And Subsequent Cell Phones Must Be Suppressed As Fruit Of The Poisonous Tree**

The failure of the January 7, 2010, wiretap application to provide the required "full and complete statement" of the facts demonstrating necessity requires that all fruits of that wiretap be suppressed. Those fruits include, among other things, every subsequent wiretap surveillance application that made similar assertions of necessity or which relied on information obtained from TP-1 and its successive surveillance orders.

18 U.S.C. § 2515 provides that no part of the contents of any wire or oral communication, and no evidence derived therefrom, may be received at certain proceedings, including trials, "if the disclosure of that information would be in violation of this chapter." *See also Giordano*, 416 U.S. at 524-25. "Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." *Rice*, 478 F.3d at 710.

A taint hearing is appropriate to determine what evidence has been obtained by exploitation of the primary illegality. *United States v. Huss*, 482 F.2d 38, 47 (1973) (citing *Alderman v. United States*, 394 U.S. 165 (1969). At a taint hearing, the proponent of suppression has the initial burden of "producing specific evidence demonstrating taint in a substantial portion of the Government's case against him."

*United States v. Sapere*, 531 F.2d 63, 66 (2d Cir. 1976); *see also Alderman*, 394 U.S. at 183; *United States v. Vilar*, 530 F. Supp. 2d 616, 641 (S.D.N.Y. 2008).

Once the proponent has met this burden, "the evidence must be suppressed unless the government proves, by a preponderance of evidence, that the evidence would have been discovered inevitably, was discovered through independent means, or that its discovery was so attenuated from the illegal search or seizure that the taint of the unlawful government conduct was dissipated." *United States v Holmes*, 505 F.3d 1288 (D.C. Cir. 2007) (*citing Alderman*, 394 U.S. at 183); *see Wong Sun v. United States*, 371 U.S. 471, 487 (1963).

Here, each affidavit subsequent to the first in support of an application for wiretap surveillance contained virtually identical averments regarding necessity. Facts were added in subsequent affidavits in some categories of alternative investigative procedures – such as physical surveillance, prior interceptions and search warrants – reflecting information obtained as a result of wiretap surveillance, including cell site and/or other types of tracking, of each of Mr. Rodriguez's preceding cell phones.[10] *See, e.g.*, Exhibit H, Samuels Affidavit of September 3, 2010 at ¶¶ 49-56 (physical surveillance), ¶ 58 (prior wire surveillance). Those facts did not alter Samuels' conclusion that the alternate

---

[10] The facts did not change in subsequent affidavits with respect to the use of confidential informants or undercover agents as none were utilized throughout the period in question. *See Id.* at ¶ 59-62.

investigative procedures were of no or limited use or would likely fail if used. *Id.* It is obvious as well that evidence derived from the first and each subsequent wiretap of Mr. Rodriguez's cell phones provided the basis for each new wiretap surveillance order. Thus, all evidence derived from the wiretap surveillance of Mr. Rodriguez's 10 cell phones, including any evidence derived from cell site or other tracking data, should be suppressed. A taint hearing should be held to determine the extent of the taint beyond the intercepted conversations themselves. *Alderman*, 394 U.S. 165; *Sapere*, 531 F.2d 63; *Huss*, 482 F.2d 38.

## POINT TWO

### COUNT TWO SHOULD BE DISMISSED AS INSUFFICIENTLY PLEADED OR MULTIPLICITOUS

Both Counts One and Two of the Indictment charge Mr. Rodriguez with conspiracy to distribute marijuana under the same statute. But while Count One, "Organization Marijuana Conspiracy," sets forth 55 overt acts allegedly committed by the named defendants (approximately 19 of them pertaining to Mr. Rodriguez), Count Two, "Mr. Rodriguez Cell Marijuana Conspiracy," alleges no overt acts and otherwise fails to provide any indication of the specific conduct allegedly committed over the nearly 20-year existence of the conspiracy. Accordingly, Count Two should be dismissed as insufficiently pleaded, as it gives Mr. Rodriguez no idea of what he must be prepared to meet. Alternatively, it should be dismissed as multiplicitous in view of the fact that both counts charge the same

offense, all of the defendants charged in Count Two are also charged in Count One, and no factual allegations distinguish the two counts.

## A. **The Indictment: Counts One and Two**

Mr. Rodriguez is charged only in the first two counts of the Superseding Indictment (S12 10 Cr. 905, Doc. #130). Those counts charge identical conduct under the same statutes – conspiracy (under 21 U.S.C. § 846) to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Additionally, all of the defendants named in Count Two are named in Count One. The Count Two defendants are, in fact, a subset of the Count One defendants.

### 1. **Count One**

Count One of the Indictment alleges that "[f]rom at least in or about 1992, up to and including in or about October 2010, Mr. Rodriguez and 44 of the 52 defendants, "and others known and unknown":[11]

> unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

*See* Indictment at ¶ 1.

Count One further alleges, "[i]t was a part and object of the conspiracy" that

---

[11]     All of the indicted defendants, except William Alcibio Delgado, Estalin Jiminez, Richard Jiminez Perez, Julio Cesar Leonardo Ramirez, Francisco Leonardo, and Deyanira, are charged in Count One of the indictment.

those same defendants "and others known and unknown":

> would and did distribute and possess with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841 (a) (1).

*Id.* at ¶ 2.

Count One also states:

> The controlled substance involved in the offense was 1,000 kilograms and more of mixtures and substances containing a detectable amount of marijuana, in violation of Title 21, United States Code, Section 841 (b) (1) (A).

*Id.* at ¶ 3.

Count One sets forth 55 overt acts allegedly committed in furtherance of the conspiracy. *Id.* at ¶ 4 (a - ccc).[12]

### 2. **Count Two**

Count Two identically alleges that between 1992 and October 2010, Mr. Rodriguez and 34 of the 44 defendants named in Count One,[13] "and others known and unknown":

> unlawfully, intentionally, and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

*Id.* at ¶ 5.

---

[12]    The overt acts alleged regarding Mr. Rodriguez appear in paragraph 4, subparagraphs t, v, w, x, y, z, aa, bb, dd, ee, ff, hh, ii, jj, ll, oo, rr, ss, and zz of Count One.

[13]    All of the defendants named in Count One are named in Count Two with the exception of Rosemary DeJesus, Alfonso Garcia, Klevi Gutierrez, Erick Fulgencio Nunez, Franklin Manuel Pacheco-Valdez, Ariel Pena, Jose Ramon Perez, Emmanuel Ramirez, Leticia Raposo, and Christopher Vizcaino. No additional defendants are named in Count Two.

Similarly, Count Two alleges that [i]t was a part and object of the conspiracy" that the above-described defendants "and others known and unknown":

> would and did distribute and possess with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 841 (a) (1).

*Id.* at ¶ 6.

The amount of the controlled substance is also the same in Count Two:

> The controlled substance involved in the offense was 1,000 kilograms and more of mixtures and substances containing a detectable amount of marijuana, in violation of Title 21, United States Code, Section 841 (b) (1) (A).

*Id.* at ¶ 7.

However, unlike Count One, no overt acts are set forth in Count Two.

## B. Count Two Should Be Dismissed As Insufficiently Pleaded

Federal Rule of Criminal Procedure 7(c)(1) provides, in relevant part, that "[t]he indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." As the Second Circuit explained in *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999):

> This requirement performs three constitutionally required functions: It fulfils the Sixth Amendment right "to be informed of the nature and cause of the accusation;" it prevents a person from being subject to double jeopardy as required by the Fifth Amendment; and it serves the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury. *See United States v. Silverman*, 430 F.2d 106, 110 (2d Cir.) (listing these three functions),

*modified,* 439 F.2d 1198 (2d Cir. 1970), *cert. denied,* 402 U.S. 953 (1971).

*Walsh,* 194 F.3d at 44. *Walsh* goes on to explain, "[a]n indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *Id.* (citation omitted). Moreover, "[i]he Indictment Clause of the Fifth Amendment 'requires that an indictment contain some amount of factual particularlity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'" *Id.* (quoting *United States v. Abrams,* 539 F. Supp. 378, 384 (S.D.N.Y. 1982)).

Courts are hesitant to dismiss even bare-boned indictments, *Walsh,* 194 F.3d at 44, but will do so when there is prejudice, as when the indictment is "completely devoid of any factual particularlity." *Id.* Examples of deficient indictments provided by the Second Circuit in *Walsh* include: *United States v. Panzavecchia,* 421 F.2d 440 (5th Cir. 1970), *cert. denied,* 404 U.S. 966 (1971) (indictment which contained three identically worded counts regarding false statements, but which failed to reveal which counts the grand jury applied to which offenses, was faulty); *Russell v. United States,* 369 U.S. 749 (1962) (indictment charging refusal to answer questions was insufficient where it did not identify the subject under inquiry at time of refusal to answer); and *United States v. Tomasetta,* 429 F.2d 978

(1st Cir. 1970) (loan sharking indictment which failed to specify means of alleged threats, location of alleged offense, and name of victim was insufficient). *See also Abrams*, 539 F. Supp. 378 (counts that allege "offense occurred over nine and twenty-four month periods…in the Southern District of New York and elsewhere," but do not allege other factual specifics, such as the name of victims or any specific details of the alleged acts, are insufficient and must be dismissed).

In *Russell*, the Supreme Court explained that the sufficiency of an indictment is to be measured, first, by "whether the indictment contains the elements of the offense intended to be charged, *and sufficiently apprises the defendant of what he must be prepared to meet*," and second, "in case any other proceedings are taken against him for a similar offense, [by] whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." 369 U.S. at 763 (citations and internal quotes omitted) (emphasis added). In *Panzavecchia*, the Fifth Circuit concluded that an indictment was insufficient if, on its face, it would be impossible to tell the specific offenses of which the defendant had been acquitted or convicted. 421 F.2d at 442. And finally, in *Tomasetta*, the First Circuit concluded, "Without sufficient information to identify that conduct which the grand jury has deemed adequate to support an indictment, an accused is at a material disadvantage in meeting the charge against him." 429 F.2d at 979 (citations and internal quotes omitted). *See also United*

*States v. Bin Laden*, 91 F. Supp. 2d 600, 608 (S.D.N.Y. 2000) (upholding indictment, but only after examining Fed. R. Crim. P. 7(c)(1) under standards of *Tomasetta* and *Russell*).

Here, Count Two alleges the bare bones statutory elements of the offense without specifying a single overt act or any specific conduct in a conspiracy alleged to have lasted for almost 20 years. There is no way for Mr. Rodriguez to determine the difference between the conduct charged in Count One and that charged in Count Two, if indeed any difference exists (we contend that none exists, *see* "C" below). Accordingly, Count Two is fundamentally flawed because it fails to satisfy the rudimentary requirements of due process or sufficient pleading under the Federal Rules, and should be dismissed.

### C. <u>Count Two Should Be Dismissed As Multiplicitous</u>

An indictment is multiplicitous when it charges a single offense multiple times, in separate counts, "when, in law and fact, only one crime has been committed." *United States v. Chacko,* 169 F.3d 140, 145 (2d Cir. 1999); *see United States v. Holmes,* 44 F.3d 1150, 1153-54 (2d Cir. 1995). "Multiplicitous indictments violate the Double Jeopardy Clause of the Fifth Amendment because they subject a person to punishment for a single crime more than once." *United States v. Sattar*, 314 F. Supp. 2d 279, 307 (SDNY 2004) (citing *United States v. Dixon,* 509 U.S. 688, 696 (1993); *Chaco,* 169 F.3d at 145). The test for

determining whether offenses are the same is whether each statutory provision requires proof of an additional fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). "*Blockburger* is not satisfied where the elements of one charged offense are subsumed within another charged offense." *United States v. Zvi*, 168 F.3d 49, 57 (2d Cir. 1999).

The offense in a charge of conspiracy is "the agreement or confederation of the conspirators to commit one or more unlawful acts." *Braverman v. United States,* 317 U.S. 49, 53 (1942). Therefore, "[a] single agreement to commit several crimes constitutes one conspiracy," but "multiple agreements to commit separate crimes constitute multiple conspiracies." *United States v. Broce,* 488 U.S. 563, 570-71 (1989). The Court of Appeals has set forth a number of factors to be considered in determining whether two conspiracies "amount to the same offense":

> The Court of Appeals has directed that, in determining whether two conspiracies amount to the "same offense," a variety of factors should be considered, *including the criminal offenses charged, the overlap of participants, the overlap of time, similarity of operation, the existence of common overt acts, the geographic scope of the alleged conspiracies or location where overt acts occurred, common objectives, and the degree of interdependence between alleged distinct conspiracies. United States v. Macchia,* 35 F.3d 662, 667 (2d Cir.1994) (citing *United States v. Korfant,* 771 F.2d 660, 662 (2d Cir.1985)).

*Sattar,* 314 F. Supp. 2d at 307 (emphasis added).

Here, the statutory provision under which Mr. Rodriguez is charged is the same in both counts, therefore the Court can dispense with the *Blockburger* test of

"whether each statutory provision requires proof of an additional fact that the other does not." *Id.* at 304. Because he is charged under the same statutory provision in both counts, there obviously is no element contained in Count One that is not contained in Count Two. *Chacko*, 169 F.3d at 146.

Nor does the government charge Mr. Rodriguez with different conduct in Count Two than in Count One. It cannot maintain that Count Two pertains to different overt acts committed in the course of the marijuana conspiracy since it does not specify any overt acts in Count Two. Nor are there different defendants charged in Count Two; rather, the defendants in Count Two were all charged in Count One (although some defendants charged in Count One are not charged in Count Two). *Cf. United States v. Jones*, 455 F.3d 134 (2d Cir. 2006) (indictment charging defendant with drug conspiracy in two separate counts not multiplicitous as a matter of law where each count alleged defendant's conspiring with different defendants for different periods of time).

We recognize that dismissal of multiplicitous counts before trial may be premature (*see United States v. Josephberg*, 459 F.3d 350 (2d Cir. 2006)). In view, however, of the lack of any specific facts in Count Two establishing that there is any difference between it and Count One, the Court should dismiss Count Two before trial. Indeed, the submission of both Counts would only serve to

confuse a jury and we ask that, should the Court decide not to dismiss Count Two pre-trial, it revisit this issue at the close of the government's case.

## POINT THREE

### THE COURT SHOULD ISSUE A PRETRIAL ORDER REQUIRING THE GOVERNMENT TO IDENTIFY, SUFFICIENTLY IN ADVANCE OF TRIAL, (1) TAPES AND RELATED TRANSCRIPTS; (2) 404(b) EVIDENCE; AND (3) EXPERT TESTIMONY IT INTENDS TO OFFER AT TRIAL, AS WELL AS ALL *GIGLIO* AND JENCKS ACT MATERIAL

The trial in this case is likely to be lengthy and complex, involving numerous witnesses and perhaps hundreds of tape-recorded conversations and related transcripts. Accordingly, and consistent with the policy of many judges in this District as well as the Federal Rules of Criminal Procedure and the Federal Rules of Evidence, we respectfully ask the Court to issue a pretrial order requiring the government, at least six weeks before the commencement of jury selection, to:

- Identify the tapes and related transcripts it intends to introduce;

- Identify all 404(b) evidence it intends to offer (*see* Fed. R. Evid. 404(b), requiring the prosecutor to "provide reasonable notice in advance of trial");

- Provide expert disclosure required by Fed. R. Crim. P. 16 (a)(1)(G);

- Provide *Giglio*/Jencks Act disclosure;

- Identify other documents it intends to introduce.

All the foregoing requests are reasonable and will both expedite the trial process and avoid the need to request adjournments while the defense reviews late-

disclosed materials. Indeed, Fed. R. Crim. P 16(a)(1)(E)(ii) mandates that the

government provide the defense an opportunity to examine documents it intends to

introduce at trial, and this obligation is not satisfied by a "document dump" of

thousands of documents.[14] The government is required to provide pretrial notice of

proposed 404(b) evidence. Pretrial expert disclosure is required to be provided,

upon request, by Fed. R. Crim. P. 16(a)(1)(G); *Giglio* material is a subset of *Brady*

and must be provided at a time sufficiently early in the proceedings to permit

necessary investigation and timely use. And although the Jencks Act itself cannot

be read to require pretrial disclosure, district courts certainly retain supervisory

---

[14] *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (reversing convictions where "Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents" would be relied upon by government at trial); *United States v. Anderson*, 416 F. Supp. 2d 110 (D.D.C. 2006) (government must identify documents it intends to use in its case-in-chief because "[g]iven the enormous volume of material produced . . . and defendant's limited resources, it is apparent that requiring defendant's counsel to peruse each page of the materials at issue . . . would materially impede defendant's counsel's ability to prepare an adequate defense."); *In re Adelphia*, 338 Bankr. 546, 551 (S.D.N.Y. 2005) ("The Court does not endorse a method of document production that merely gives the requesting party access to a 'document dump,' with an instruction to the party to 'go fish.'") (citations omitted); *United States v. Upton*, 856 F. Supp. 727, 746-47 (E.D.N.Y. 1994) (government must identify specific documents it will use at trial); *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998) ("the government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack"), *rev'd in part on other grounds*, 176 F.3d 517 (D.C. Cir. 1999); *United States v. Poindexter*, 727 F. Supp. 1470, 1484 (D.D.C. 1989) ("many reasons grounded in fairness" why government must specify documents it will rely on at trial, rather than simply "identify[ing] several thousand pages, any of which it 'may' rely on at trial"); *United States v. Locascio*, 2006 WL 2796320 at *7 (D.S.C. 2006) (defense should not be put to the expense of reviewing thousands of files while hoping to "stumble across" which ones government would use at trial, and "basic fairness, an opportunity for adequate preparation for trial, avoidance of surprise or unfair advantage, as well as the elimination of possible mid-trial recesses" required pretrial identification of government trial exhibits).

authority to assure that defendants have an ample opportunity to review, absorb and use such materials – hopefully without delay of trial. *See In re United States (Frank Coppa, Sr.)*, 267 F.3d 132, 146 (2d Cir. 2001) (remanding to provide the "District Court an opportunity to determine what disclosure order, if any, it deems appropriate as a matter of case management.").

## **POINT FOUR**

### MR. RODRIGUEZ JOINS IN THE ARGUMENTS OF HIS CODEFENDANTS TO THE EXTENT NOT INCONSISTENT WITH THE POSITIONS ADVANCED HEREIN

We respectfully join in the issues and arguments raised by Mr. Rodriguez's co-defendants that are not inconsistent with those raised herein.

## Conclusion

For the foregoing reasons, the Court should grant Mr. Rodriguez's motion in its entirety.

Dated: December 21, 2011

_____
RICHARD WARE LEVITT
Levitt & Kaizer
40 Fulton Street, 23rd Floor
New York, New York 10038
(212) 480-4000
*Attorneys for Manuel Rodriguez*

On the brief:
Richard Levitt
Yvonne Shivers